THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWIN SUAREZ *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—88—0495, 1—88—0510 cons.

Opinion filed September 17, 1991.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant Carlos Creasy.

Robert A. Willis, of Chicago, for appellant Edwin Suarez.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Codefendants, Edwin Suarez and Carlos Creasy, were jointly indicted for murder and three counts of attempted murder arising from a September 26, 1985, shooting at a tavern, which left one person dead and three others wounded. Defendants were granted a trial severance. A jury found Suarez guilty of murder and attempted murder. He received a 40-year sentence for the murder and one 15-year term for each count of attempted murder, to be served concurrently with one another, but consecutively to the murder sentence. Another jury convicted Creasy of murder, but acquitted him of all attempt charges. He received a 40-year term of imprisonment. Defendants' subsequent appeals were consolidated.

Suarez argues that (1) he was illegally arrested and that his statements should have been suppressed as the fruit of the illegal arrest; (2) numerous trial errors deprived him of a fair trial; and (3) he was

improperly sentenced to consecutive terms of imprisonment. Creasy challenges (1) the systematic exclusion of black venirepersons; (2) the legality of his arrest; (3) the voluntariness of his confession; (4) his preclusion from cross-examining two witnesses; (5) the murder and voluntary manslaughter instructions given; (6) his guilt beyond a reasonable doubt; (7) the State's closing argument; and (8) his 40-year sentence. For the following reasons, we affirm Suarez's and Creasy's convictions and sentences, and remand the cause for a hearing on Creasy's claim of a *Batson* violation during jury selection, retaining jurisdiction over Creasy's case to review the circuit court's findings after the hearing.

During pretrial proceedings, both defendants' motions to quash arrest and suppress allegedly invalid confessions were denied after a joint hearing, where the following evidence was adduced.

At 9 p.m. on September 25, Chicago police officer Joseph Rodriguez, a gang unit specialist, saw both Creasy and Suarez at Lathrop Homes, along with several members of the Insane Unknowns (Unknowns) street gang. Suarez, whom Rodriguez had known for 8 to 10 years, was the leader of the Unknowns faction from the Wrightwood-Halsted Street area. The other Unknowns faction, the K-Town Unknowns, operates in the Pulaski-Division Street neighborhood. Lathrop Homes is in the area known as the latter's "turf." Since all were dressed in the gang's "colors," which suggested impending gang violence, Rodriguez spoke with the group. Suarez wore a dark corduroy jacket and brown corduroy pants. Creasy, unknown to Rodriguez prior to that night, wore white pants and a black sweatshirt.

Later that night, Rodriguez investigated the shooting at the tavern on Clybourn Avenue, a hangout of the Unknowns' rivals, the Simon City Royals (Royals). The dead man, Darryl "Bulldog" Griggs, was a Royals leader. When Rodriguez heard the description of the offenders, he recalled his earlier encounter with the Unknowns and sought them out. Rodriguez arrived at Racine and Addison, where Suarez lived. A taxi pulled up, and Suarez got out, wearing the same dark pants as before, but now carrying the jacket he had worn earlier. The taxi driver stated that he had picked up Suarez and a girl near Damen and Fullerton, four blocks from the shooting. Suarez told Rodriguez that he had been at Lathrop Homes with his girlfriend at the time of the shooting. He denied that any K-Town Unknowns brought a gun to Lathrop Homes to make a hit or spoke of making a hit. A person named "Shorty" could have had a gun with him, and Suarez was willing to help with the investigation. He entered a squad car, after first informing his father as to his whereabouts. Rodriguez and

Suarez, seeking "Shorty," went to Pulaski and Division at Suarez's suggestion. This took 1½ hours. They then went to the police station. Suarez remained there for 15 to 30 minutes, and his father took him home. Rodriguez denied drawing his gun and handcuffing Suarez. When Suarez left the station, he told Rodriguez that he would get back to him after he had "check[ed] out" Shorty.

Chicago police detectives James Gildea and Robert Elmore investigated the shooting. At the scene, Ronald O'Neal, who lived above the tavern, revealed that he heard shots around 12:15 a.m.; looked out the window; and saw two people running from the tavern. One yelled "Royal killers, Unknown love." The other turned back and fired an additional shot toward the tavern. They then fled east toward Ashland Avenue. O'Neal described both men as being in their early 20's and Hispanic. The shorter of the two wore a hooded sweatshirt, which covered his head, and white jogging pants. The taller man had on a waist-length brown or dark-colored jacket. Both carried guns. Also at the scene, an anonymous citizen told Gildea that a station wagon had driven past the tavern two nights earlier. Several shots were fired at people on the street from this auto. Gildea found the license number of the car to have been registered to Suarez's father.

Gildea reported the assailants' descriptions to Rodriguez, who was at the scene at that time. Rodriguez detailed his previous meeting with the Unknowns at Lathrop Homes to Gildea. Gildea next saw Rodriguez again at 3 a.m., and Rodriguez told him about his meeting with Suarez at Racine and Addison. Gildea then went to the Suarez house at about 5:30 a.m., with two other officers.

At the Suarez home, Gildea was allowed entry by Suarez's father. Suarez told police that he knew Griggs for a long time and would go with them to help with the investigation. At the station, Suarez told police that he knew nothing about the shooting, but that "with the passage of time" he might be able to "come up with some information." Suarez was in an unlocked room and was allowed to use the washroom unaccompanied. Suarez was not handcuffed either at his home or at the station.

Suarez admitted meeting Rodriguez at Lathrop Homes, but denied that he willingly accompanied Rodriguez from his home at Racine and Addison. He claimed that he was arrested by police there at 12:30 a.m. on September 26, 1985, after exiting a cab. Six or seven officers were with Rodriguez, who told Suarez that he (Suarez) "had something to do with the shooting" of a man named "Bulldog." Although Suarez denied involvement, Rodriguez told him he was going to place him under arrest. Suarez was allowed to go inside his house,

and Rodriguez told his father that they were taking him into custody, adding that they would bring him "right back." Suarez was driven around in the squad car for 30 to 40 minutes, then taken to the station, put into a room, and questioned for 30 minutes. Police later released him to his father at the station. Suarez returned home and fell asleep, but later was awakened by police around 4 a.m. His father allowed them in, and they told Suarez to get dressed and come with them. The officers did not draw their guns, but had no warrant.

Chicago police detective Frank Kajari assumed the investigation after Gildea and Elmore went off duty. At 10 a.m. he interviewed Suarez, who agreed to talk after being given his *Miranda* warnings. Suarez was not handcuffed and willingly took, but failed, a polygraph test. Suarez understood both the "polygraph waiver" and his *Miranda* warnings and signed various forms to that effect. Suarez further stated that he was in good health; was not given promises; was not threatened; was given food; and was not abused in any way. Kajari later spoke with Suarez at 3 p.m. During this conversation, Chicago police officer Patrick Walsh, a gang unit specialist, came into the room, and Suarez asked to speak to him alone.

Officer Walsh, who knew Suarez for a number of years, spoke with him between 3 and 4 p.m. on September 26, after again giving him *Miranda* warnings. Suarez told him that the person they were looking for in connection with the homicide was called "G-Man," a member of the K-Town Unknowns; he did not know his real name. The police nickname file revealed that G-Man was Carlos Creasy. At 7:30 p.m., Walsh showed Suarez a photo of Creasy, whom Suarez identified as G-Man.

Creasy testified that on September 26, 1985, he was asleep at his home during the late afternoon hours and was awakened by "loud" knocking at the front door. The callers identified themselves as police officers. When Creasy inched the door open, "they just rushed in, all of a sudden," but did not have their guns drawn. They informed Creasy that they had to take him to the station, but produced no warrant. At the station, Creasy took part in a lineup and was fingerprinted and photographed. Creasy admitted membership in a different faction of the Unknowns than Suarez. He and Suarez were at Lathrop Homes on September 25. Creasy's nickname is "G-Man," and Suarez is also known as "Weso."

Chicago police officer Robert Schatzel first unsuccessfully sought to find Creasy at his house on September 26, at 6 p.m. and later returned to the house at 10:30 p.m. Creasy answered the door and asked him in. Schatzel told him that the detectives wished to speak

with him regarding a homicide. Creasy was cooperative and willingly accompanied him. Creasy was not handcuffed, nor were any guns drawn during the encounter. Chicago police officer Bernard Brennan accompanied Schatzel to Creasy's home. Creasy was not handcuffed, but was placed in a locked room upon arrival at the station. Chicago police officer Dennis Gray spoke with Creasy at 11 p.m. on the 26th. Creasy was not handcuffed, beaten or promised leniency.

Detective Elmore recounted a conversation he had with Suarez in the presence of Detective Gildea at 4:30 a.m. on September 27. After being given his *Miranda* warnings, Suarez told him that in the early morning hours of the 26th, he was driving a car with his girlfriend, Josie, and someone known to him only as "G-Man." As they passed the tavern on Clybourn, Griggs stood in front with a pool cue in his hands and flashed a gang sign at them. Suarez and G-Man then discussed going back to the tavern "to get a Royal." Josie stayed with the car, which was parked about three blocks away from the tavern, and the two men walked over. Suarez carried a 9 mm pistol, and G-Man was armed with a .38-caliber revolver. When they entered the tavern, Suarez saw Griggs at the end of the bar. They began shooting as Griggs tried to run. They then went back to the car, where one of the guns accidentally discharged. As they drove away, Suarez hit another car and, unable to drive any farther, parked his car in an alley. He gave G-Man his gun, and G-Man left. Suarez took Josie home in a taxi and then went to his own home, where he met Rodriguez.

On September 27, both Creasy and Suarez took part in a six-man lineup at 2:45 p.m., where the tavern bartender identified Creasy as one of the gunmen. After the lineup, Creasy spoke with Kajari, who then spoke with Walsh. Leaving the station, Walsh returned a few hours later with a .25-caliber semi-automatic pistol and a .38-caliber revolver. Creasy refused offers of food, but accepted a beverage. At 10 p.m., Creasy gave an assistant State's Attorney an oral statement, which he repeated before a court reporter, whose notes later were transcribed. Creasy reviewed the statement, made corrections and signed it at about 1 a.m. His photograph was also taken just after the statement was signed.

Assistant State's Attorney (ASA) Wayne Jakalski was present during the statement, and Creasy indicated to him that he understood his rights; was well treated; had been allowed to use the washroom; and had been given something to drink. Jakalski saw Creasy correct the statement and sign it. The statement admitted Creasy's participation in the shooting while armed with a .38-caliber revolver and that no one in the tavern shot at him or Suarez at any time before they

began shooting. He admitted giving two pistols to a man named "Prince" after the shootings.

The circuit court found probable cause for police to arrest each defendant and that the statements given were voluntary and made pursuant to lawful arrests.

The evidence adduced at each trial was substantially the same; differences will be noted where necessary. Waylon Johns managed the tavern on the night in question. Griggs was seated at the rear of the bar. At 12:15 a.m., Johns heard the front door open, and shooting began seconds later. At that time, Johns was facing the rear of the tavern, and he saw Griggs get up and try to go around the bar. Griggs had nothing in his hands. When the shooting began, Johns grabbed the woman next to him and hit the floor. While on the floor, he saw two sets of legs go by. One set of legs stopped behind him, and the other set continued toward the area behind the bar. He could hear two different guns firing. When Johns glanced up, he saw one man holding the door and the other man walking out. As the man walked out, he fired another shot into the bar. Both men were hooded. After the gunmen fled, Johns phoned police.

Geraldine Sampson Harkins, seated next to Johns when the shooting started at 12:15 a.m., heard the front door open and saw two men walk toward the bar. The shorter of the two was in front. Harkins could not see their faces. She then heard shots and saw Griggs move toward the bar. He had nothing in his hands. Johns then pushed her to the floor. From there, she saw one gunman run toward the back of the bar, near Griggs. After the shooting, she ran to the washroom and discovered that she had been shot in the right shoulder, the right arm and the right jaw.

Thomas Houser, tending the bar near the area where Griggs was standing at 12:15 a.m., saw the front door open and two men enter in "full stride," one in front of the other. The man in front, identified as Creasy, wore a hooded sweatshirt and was short and stocky. The second man wore a khaki coat with a hood and was taller and bigger than the other man. Both had their hands in their pockets. Griggs was unarmed. Sensing trouble, Houser dove for the floor, but was shot nonetheless. At least 10 more shots rang out from the middle of the bar and from the end of the bar. Houser was shot in the chest and in the left arm. After his discharge from the hospital, he identified Creasy in a lineup. At the time of the trials, Houser had a misdemeanor battery charge pending in the circuit court as well as a contempt of court charge for failing to appear in court in the case at bar. Houser also had a prior conviction for aggravated battery.

Thomas Tovares, also in the tavern during the shooting, was sitting at the end of the bar. He saw a Latino man 5 feet 7 inches, 250 to 260 pounds, pointing a gun. After a lady was shot, Tovares was shot twice, once in the left shoulder and once in the stomach.

Chicago police officer Carl Mesikapp, one of the first officers to arrive on the scene, noticed two men lying on the floor, including Griggs, and called an ambulance. After Griggs was removed, Mesikapp observed a toy pistol on the floor near the location where Griggs had been lying. Evidence technician Thaddeus Melko examined the crime scene and took a photograph of the toy. He found no fingerprints on it. Melko also discovered five shell casings and four bullets in the tavern.

Ronald O'Neal lived above the tavern. At 12:15 a.m., he heard gunfire coming from the bar, looked out his window and saw two men backing out of the tavern. As they jogged toward his window, their hoods flew off. He identified one of the men as Suarez, whom he knew as "Weso," the leader of the Unknowns. The other man was shorter and shouted, "Unknown love, Royal killers," as Suarez fired a shot toward the bar. When police arrived later, O'Neal told them what he observed and accompanied several officers around the neighborhood in search of the men. He was with police at Racine and Addison when Suarez alighted from the cab. Suarez was still wearing the same dark pants he had on earlier, but now carried his coat. Although he recognized Suarez at that time as one of the gunmen, O'Neal never told police because he was "scared." He first identified Suarez on November 12, 1987. At the time of the trial, O'Neal had a case pending in the circuit court for concealing a homicide. He was not promised leniency in return for his testimony.

Officers Rodriguez, Gildea, and Walsh all testified in a manner consistent with their pretrial testimony. Gildea received a toy gun at the scene and later inventoried it as property recovered from the scene. Rodriguez also informed both juries of the overall gang structure in Chicago and the allegiances and rivalries of particular groups.

Ernest Walker of the Chicago Police Department Crime Lab tested the bullets recovered from the scene and the guns which later were found by police. Two of the fired bullets found at the scene were .38 caliber and were fired from the .38-caliber gun later found by police. The other fired bullets found in the tavern were 9 mm, as were the five expended shell casings, and were fired from the same weapon. The bullet found in Suarez's car was .25 caliber and was fired from the .25-caliber semi-automatic also found later by police.

Dr. Barry Lifschultz of the Cook County medical examiner's office performed the autopsy; Griggs died from multiple gunshot wounds to the side and to the back.

Carmen and Fernando Suarez testified on their son's behalf as to their activities on September 26 and their interaction with police.

Most of the above evidence was also brought out at Creasy's trial. In addition, Chicago police detective Paul Carroll stated that he located Suarez's car on Fullerton Avenue and, after obtaining a search warrant, found in it a discharged bullet and a clip for a .25-caliber semi-automatic weapon. Carroll was also present during the lineup. Creasy was the third individual from the left. Dennis "Prince" Archilla was the fifth man from the left. During the lineup, Carroll saw Creasy lean toward Archilla and heard him tell Archilla to say "you were with me." This occurred three times during the lineup, even after the men were told to keep quiet. Detective Walsh further recounted that Archilla later accompanied him to a house on North Hoyne Avenue. In a rear bedroom, Walsh found two guns hidden in two different boots.

ASA Jakalski testified that on September 27, he spoke with Creasy, who agreed to provide a statement, later transcribed, in which Creasy indicated that as he, Suarez, and Josie were driving by the tavern, they saw someone in front of the building holding a pool stick. They then parked the car two blocks from the tavern, and he and Suarez returned to the tavern on foot. At that time, Suarez gave Creasy a .38-caliber gun. Creasy "thought" he saw a pistol or a knife in someone's hand. After they fled, Creasy again shot in the air. They then returned to the car, and as they were driving away, Suarez hit another car. Suarez told Creasy to leave, and Josie gave him a .25-caliber handgun. Suarez kept the 9 mm pistol with him. Creasy then went to a friend's house and gave him the guns.

Creasy testified on his own behalf. On September 25, he was with Suarez at Lathrop Homes, drinking and smoking. He left with Suarez and his girlfriend. As they "cruised" around the neighborhood, Suarez stopped once and got out. When he returned, he gave Creasy a .38-caliber gun and they went to a tavern, where a white man pulled out a pistol and began shooting at them. Creasy then began firing. They ran out and went back to the car. Creasy stated that he had been beaten by police and lied in his statement to avoid further beatings.

In rebuttal, Kajari swore that Creasy was never beaten while in his custody. Wayne Kinzey, a Cook County jail paramedic, testified that when he examined Creasy during his medical intake procedure,

Creasy had no cuts, bruises or swelling on his face or body and made no complaints of such injuries.

## I

Suarez initially asserts that his oral statement and the weapons recovered pursuant to it should have been suppressed as products of an illegal arrest.

Whether probable cause exists is a commonsense, practical question to be determined by the totality of the circumstances. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Generally, probable cause exists when the circumstances within the arresting officer's knowledge are sufficient to warrant a reasonably cautious person to believe that an offense has been committed and the person arrested committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Probable cause may be founded upon evidence which would not be admissible at trial and which need not be sufficient to establish guilt beyond a reasonable doubt. (*People v. Green* (1980), 88 Ill. App. 3d 929, 410 N.E.2d 1003.) Only where a finding of probable cause constitutes manifest error will that ruling be reversed. *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.

■ Here, Rodriguez told Gildea that Suarez was observed near the scene of the shooting; he fit the description of one of the offenders; and he had taken a taxi home from Damen and Fullerton Avenues, an area near the tavern. Gildea also knew that Suarez was the leader of the Unknowns, the gang vocally identified by one of the gunmen immediately after the shooting, and that the murdered victim was a leader of the Royals, an Unknown rival, also proclaimed by the gunman. Gildea further learned that the Suarez car had been seen at the tavern two nights earlier, when its occupants participated in a "drive-by" style shooting. These facts, when viewed in the totality of the circumstances, amply support the circuit court's finding of probable cause.

The circuit court properly ruled that Suarez's arrest was lawful and his statement and the weapon seized need not have been excluded.

## II

Suarez contends that he was denied a fair trial both by the prosecutor's references to gangs in his opening statement and the testimony regarding gangs in general, and Suarez's gang membership and tattoos in particular.

■ Suarez did not object to the comments made during the opening statement either at the time they were made or in his written post-trial motion. Such failure results in waiver upon review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) As to the other complained-of testimony, the State argues that any prejudice which may have resulted from it was outweighed by the relevance of the evidence. We agree.

Rodriguez's testimony regarding the "turf" of each gang was relevant because it explained Suarez and Creasy's association as leaders of the two Unknowns factions. The testimony also revealed the significance of the slogan shouted by one of the gunmen as they left the tavern area and the motivation behind the seemingly random, unprovoked shootout. Evidence of Suarez's tattoos, although subject to a sustained defense objection, nevertheless corroborated his custodial statement of gang affiliation, which became relevant when, at trial, the defense implied that Suarez was the innocent victim of a police frame-up. Rodriguez's testimony provided insight to the gang structure in Chicago and to the behavior patterns of their members. Such information, not generally known to those outside of such groups, was properly admitted because it was relevant to the crime charged (see *People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840), and it established motive. See *People v. Ayala* (1990), 208 Ill. App. 3d 586, 592, 567 N.E.2d 450; *People v. Rivera* (1986), 145 Ill. App. 3d 609, 618, 495 N.E.2d 1088.

### III

Suarez also identifies as circuit court error the admission into evidence of the .25-caliber semi-automatic pistol that his girlfriend kept in the getaway car. The State argues that this issue has been waived; however, the record reveals that an objection was made at the time of the gun's admission into evidence. Suarez also raised the issue in his motion for a new trial.

■ The gun corroborated Suarez's confession to the murder, a statement which, at trial, defense counsel downplayed as the product of a police frame-up. In the statement, Suarez told police that he left Josie in the car, armed with a .25 automatic pistol, while he and Creasy went to the tavern. When the men returned to the car, a shot was discharged accidentally. Ballistics tests revealed that the discharged shot was fired from the .25 automatic later found by police. Based upon this record, the admission of the weapon, as part of the chain of relevant circumstances involving the shootings and corroborative of Suarez's confession, was not error. See *People v. Vella* (1985),

133 Ill. App. 3d 104, 118, 478 N.E.2d 593; *People v. Washington* (1984), 127 Ill. App. 3d 365, 383, 468 N.E.2d 1285.

## IV

Suarez contends that several comments made by the prosecutor during closing argument deprived him of a fair trial.

None of the remarks objected to at trial were specifically mentioned in Suarez's post-trial motion. In order to preserve an issue for review, a timely objection must be made and the issue must be raised in the motion for a new trial. (*People v. Enoch*, 122 Ill. 2d at 186.) Moreover, a defendant must set forth his objections to the prosecutor's closing arguments with specificity. *People v. Surles* (1984), 126 Ill. App. 3d 216, 226, 466 N.E.2d 1295.

Nevertheless, having carefully reviewed the cases Suarez cites in support of his allegations and the remarks complained of within the context of the closing argument, we are satisfied that none of the remarks, whether considered individually or cumulatively, resulted in substantial error, constituted a material factor in conviction or operated to deny Suarez a fair trial. *People v. Morando* (1988), 169 Ill. App. 3d 716, 733, 523 N.E.2d 1061.

## V

Suarez lastly argues that his consecutive sentences of 40 years for murder and 15 years for attempted murder were error because the court failed to state on the record that the sentences were necessary to protect the public.

Generally, multiple sentences for offenses which were committed as a part of a single course of conduct during which there was no substantial change in the nature of the criminal objective are to be imposed to run concurrently. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).) An exception to this general rule exists, however, where, as here, one of the offenses is a Class X or Class 1 felony and defendant inflicted severe bodily injury, in which event it is within the sentencing court's discretion to impose consecutive sentences. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).) If consecutive sentences are imposed, the sentencing is governed by section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b)), which provides, among other things, that the court must be of the opinion that such a term is required to protect the public from defendant's further criminal conduct, as set forth in the record.

At bar, Suarez's failure to request a specific finding of the sentencing court relative to the protection of the public or to complain of

an insufficiently articulated basis for the required statutory finding resulted in a waiver of the issue upon review. See *People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473; *People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855.

Notwithstanding any waiver, the record reveals that Suarez's sentence was proper in light of the nature of the crime and of Suarez's history and character as reflected in the presentence report. No abuse of discretion appears.

## VI

Creasy contends that his right to a jury drawn from a fair cross-section of the community and to equal protection of the laws were violated by the prosecutor's use of three peremptory challenges to exclude black venirepersons, citing *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

During jury selection, the prosecution used three of its five peremptory challenges to exclude black venirepersons. After the first two black potential jurors were excused, defense counsel objected and asked that the State explain the basis for its challenges. Counsel argued that although there were "relatively few blacks who had made it into the jury box up to this point," Creasy was a member of a minority group, and that the excluded black venirepersons appeared to be similarly situated to a number of other persons who had been accepted as jurors. The circuit court overruled the objection, stating that

"[t]here have been five [black venirepersons] and two have excused themselves [for cause], and especially in that this defendant is not a black, I do not think the State should be required to explain their peremptory challenges."

After the jury and the alternates were chosen, the following colloquy occurred between the court, defense counsel, and the assistant State's Attorney:

"[DEFENSE COUNSEL]: Just a short thing. One, I wanted to make it clear that we indicated before that we were asking that the State explain their reasons for striking black jurors.

They did strike an additional black juror, *** after we had made that request. There is, in fact, one black juror on the jury at this point, Miss Constance—

THE COURT: Clay.

[DEFENSE COUNSEL]: Miss Constance Clay.

Since I raised that issue, I just wanted to make those facts clear on the record.

* * *

THE COURT: All right. Okay.

[ASSISTANT STATE'S ATTORNEY]: Judge, just so the record is clear, his client is Hispanic. There is a Hispanic juror on there. The State had additional challenges available.

There were, in fact, no racial reasons for any of the jurors who were, in fact, excused from the State's perspective.

We do not believe the defendant is in the same suspect class as any of those jurors that were excused today in the meantime.

THE COURT: Okay."

We initially note that Creasy's standing to assert such a discrimination claim recently was upheld by the United States Supreme Court in *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (*Powers*). Absent counsel's remarks as to the race of the jurors chosen, the record does not reveal the racial composition of the venire, or the racial composition of the petit jury. As a result, the State claims Creasy has waived the argument. Courts have considered such a record as inadequate for purposes of review, constituting a waiver of the issue (see *People v. Gaines* (1981), 88 Ill. 2d 342, 358-59, 430 N.E.2d 1046, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285; *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1085, 502 N.E.2d 304); however, because of *Powers'* recentness we decline to apply the waiver rule in the instant case. 134 Ill. 2d R. 615(a). See also *People v. Young* (1989), 128 Ill. 2d 1, 48-49, 538 N.E.2d 461.

The circuit court's comments, quoted above, permit an inference that the court believed Creasy could not raise the issue of racial discrimination in the exclusion of black potential jurors. Although neither the circuit court, the State nor Creasy could have anticipated the *Powers* decision, the circuit court's summary denial of Creasy's objection to the possibly prejudicial jury selection proceedings necessitates remanding the cause for a proper *Batson* hearing. (See *People v. Allen* (1987), 168 Ill. App. 3d 397, 400, 521 N.E.2d 1172.) Moreover, since the outcome of the trial at issue here, our supreme court has specifically disapproved of "collapsing * * * a methodical *Batson* hearing procedure into an undifferentiated review of defense and State contentions" (*People v. Garrett* (1990), 139 Ill. 2d 189, 201, 564 N.E.2d 784) as appears to have occurred here.

■ Accordingly, this cause is remanded to the circuit court of Cook County for a hearing to be conducted in accordance with *People v. Garrett*, at which Creasy will be permitted to present evidence to

substantiate his claim of unconstitutional discrimination in the exercise of peremptory challenges during jury selection. If the circuit court finds that a *prima facie* showing of such discrimination has been made, it will then determine whether or not there is a neutral explanation by the State for its exercise of the questioned challenges. The court shall make findings of fact and conclusions of law which, together with a certified report of proceedings, shall be filed with the clerk of this court within 58 days of the filing of this opinion. This court retains jurisdiction for purposes of reviewing the determination of the circuit court; Creasy and the State will be allowed to submit timely supplemental briefs addressing the issue in this court. See *People v. Garrett*, 139 Ill. 2d at 195.

Although we remand Creasy's case for a *Batson* hearing, we will consider Creasy's other assertions of error, since these claims could affect the necessity to reverse or reverse and remand for a new trial irrespective of the *Batson* proceedings.

## VII

Creasy maintains that his arrest was illegal and his motion to quash his arrest and suppress evidence should have been sustained. The State argues that probable cause existed for Creasy's arrest because he fit an offender's description possessed by police and was implicated by Suarez.

Creasy challenges Suarez's statement as an insufficient ground for probable cause in view of Suarez's own role as one of the perpetrators of the crime. In *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998, our supreme court, in addressing a similar argument, rejected the claim that uncorroborated statements by an arrestee can never constitute probable cause for the arrest of a co-offender. To be considered in such instances are the totality of circumstances, the relative weight of various indicia of reliability, the information available within context of corroborating evidence, and the arresting officer's knowledge and experience.

Independent corroboration here enhanced Suarez's reliability, which included police knowledge that Creasy was a member of the K-Town Unknowns, a gang hostile to the Royals, confirming Suarez's initial identification of G-Man as a K-Town Unknown; there were two gunmen; Creasy matched the physical description of one of them given by witnesses; and Creasy, dressed in gang colors, was seen with Suarez near the scene before the shooting. (*People v. James*, 118 Ill. 2d 214, 514 N.E.2d 998.) Moreover, there is no evidence that Suarez was offered any inducement to implicate Creasy. Indeed, Suarez re-

mained at the station even after he had named Creasy as one of the gunmen. These facts were sufficient to establish reasonable police belief that Creasy took part in the shooting. See *People v. Johnson* (1989), 187 Ill. App. 3d 756, 771-73, 544 N.E.2d 392.

## VIII

Creasy insists that his confession should have been suppressed because it was given involuntarily, when police deprived him of food and sleep.

■ The State must prove voluntariness by a preponderance of the evidence; appellate review is limited to whether the voluntariness finding is against the manifest weight of the evidence. (*People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 51.) Creasy was interviewed on six occasions, mostly for short periods of time, and once for an hour during his 23-hour detention. When Creasy was not being interviewed by police, he was not handcuffed and was left alone in an interview room. Creasy was offered, but refused, food. Police officers denied hitting, torturing or abusing Creasy in any way, and Creasy himself told ASA Jakalski that he was not mistreated. Although a public defender's investigator saw Creasy bruised, this observation was made a day after Creasy's confession, when he was incarcerated at the Cook County jail. A paramedic who examined him prior to his jailhouse admission saw no bruises, cuts or any signs of physical violence on Creasy's body. The circuit court's finding that the statement was voluntary was not against the manifest weight of the evidence. See *People v. Dale* (1989), 189 Ill. App. 3d 704, 718, 545 N.E.2d 521.

## IX

Creasy urges deprivation of his constitutional right to confront witnesses when the court's ruling *in limine* prohibited him from eliciting the facts and circumstances of the charges pending against witnesses and establishing the basis of any consideration from the State in exchange for their testimony.

■ A witness may be cross-examined regarding those matters which would show bias, motive, or willingness to testify. (*People v. Owens* (1984), 102 Ill. 2d 88, 103, 464 N.E.2d 261.) The latitude of such an inquiry, however, is within the circuit court's discretion; its ruling will be reversed only where an abuse thereof results in manifest prejudice to defendant. *People v. Brisbon* (1985), 106 Ill. 2d 342, 362, 478 N.E.2d 402.

At bar, the jury was made aware of all relevant areas of impeachment of both witnesses, including the fact that both O'Neal and

Houser were facing charges and that Houser was residing in a witness protection area of the county jail. Defense counsel was permitted to ask if any deal or promise of leniency had been made and both responded in the negative. Based upon this record, no prejudice to defendant or abuse of discretion is apparent.

## X

Creasy next asserts that the State failed to prove him guilty beyond a reasonable doubt.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) Upon review, the evidence will be considered in the light most favorable to the prosecution, determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) It is sufficient to sustain a charge of murder if defendant knew his acts " 'create[d] a strong probability of death or great bodily harm.' " *People v. Bell* (1983), 113 Ill. App. 3d 588, 593, 447 N.E.2d 909, quoting Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2).

■■■ Legal accountability must be proved beyond a reasonable doubt, demonstrating that defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense, either before or during the commission of the offense, and such participation must have been with the concurrent specific intent to promote or facilitate the commission of the offense. (*People v. Freeman* (1981), 101 Ill. App. 3d 1014, 428 N.E.2d 1073.) The State is deemed to have met its burden where it proves "beyond a reasonable doubt that defendant shared the criminal intent of the principal, or that there was a community of unlawful purpose." (*People v. Hill* (1977), 53 Ill. App. 3d 280, 284, 368 N.E.2d 714.) Proof of community of purpose need not be expressly stated, but may be inferred from the circumstances surrounding the commission of the act. *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.

■■■ Considering all the evidence at bar in the light most favorable to the prosecution, including the witness' testimony and identification as well as the testimony of the investigating officers and the medical and ballistic evidence, a trier of fact readily could find beyond a reasonable doubt that Creasy committed the acts, as either a principal or an accountable party.

## XI

Creasy next alleges that the murder and voluntary manslaughter instructions given at trial were defective under *People v. Reddick* (1988), 123 Ill. 2d 184, 197, 526 N.E.2d 141.

The State initially contends that the *Reddick* decision should not be given retroactive effect. Our supreme court, however, has held that *Reddick* is of constitutional dimension and must be applied, as here, to defendants whose cases were pending on direct review when it was decided. (*People v. Shields* (1991), 143 Ill. 2d 435, 443-45.) The *Reddick* holding, therefore, must be applied to Creasy. In *Shields* the supreme court also noted that constitutional errors are not necessarily reversible where they are deemed harmless beyond a reasonable doubt. *People v. Shields*, 143 Ill. 2d at 445.

There is no evidence in the present case that Griggs or anyone else in the bar threatened or injured Creasy. The only evidence suggesting that the victims "may have" been armed was in Creasy's confession where he "thought" that someone may have had a knife or a pistol. In that confession, Creasy admitted that no one shot at him or Suarez first. There was no other evidence that anyone shot at Creasy. On the stand, however, Creasy swore that a Caucasian man pulled out a gun and began shooting. Only a toy pistol was found on the floor behind the bar; however, such a gun could not be fired. Moreover, Griggs was shot in the side and the back, which tends to show that he was turning to flee from the gunmen when the fatal shot was fired. This inference is supported by several witnesses who saw Griggs turn and run toward the bar when the shooting began. In addition, witnesses stated that they saw no weapon in Griggs' hands at the time of the shooting and that only two guns were fired.

The *Reddick* errors in this case were harmless beyond a reasonable doubt; the incorrect instructions could not have affected the jury's verdict. See *People v. Austin* (1989), 133 Ill. 2d 118, 124, 549 N.E.2d 331.

## XII

Creasy also contends that several comments made by the prosecutor during closing argument deprived him of a fair trial.

None of the remarks cited by Creasy were objected to at trial or noted in the post-trial motion. A timely objection must be made, and the issue must be raised in the motion for a new trial, in order to secure appellate review. (*People v. Enoch*, 122 Ill. 2d at 186.) Also, objections to the prosecutor's closing arguments must be made

with specificity. *People v. Surles* (1984), 126 Ill. App. 3d 216, 226, 446 N.E.2d 1295.

In any event, the remarks complained of within the context of the closing arguments, whether considered individually or cumulatively, did not result in substantial error, constitute a material factor in conviction, or operate to deny Creasy a fair trial. *People v. Morando* (1988), 169 Ill. App. 3d 716, 733, 523 N.E.2d 1061.

### XIII

Finally, Creasy argues that his 40-year sentence was excessive in light of his passive involvement in the murder and his rehabilitative potential.

■■■ Sentencing, discretionary with the circuit court, will not be changed upon review absent an abuse thereof. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) At bar, the circuit court considered Creasy's presentence report, which contained information as to his age, employment, military and family background; criminal history; letters submitted by personnel of the Illinois National Guard on Creasy's behalf; and defense counsel's argument for a minimum 20-year sentence. The State, however, sought an extended 80-year term, pointing out Creasy's longtime gang involvement, the wantonness of the crime committed and the injury to the innocent bystanders. Under these facts, no abuse of discretion appears. The sentence, within the statutory range provided in the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)), was not excessive.

For the reasons that have been discussed, Suarez's conviction and sentences (No. 1—88—0495) are affirmed. Creasy's conviction and sentence (No. 1—88—0510) are affirmed in part, but remanded with instructions, this court retaining jurisdiction to review the *Batson* proceedings.

Affirmed in part; remanded with instructions.

SCARIANO, P.J., and DiVITO, J., concur.

BATSON REVIEW AFTER REMAND IN No. 1—88—0510

This court retained jurisdiction to review the *Batson* proceedings, if necessary. On remand, the circuit court ruled that Creasy failed to establish a *prima facie* case of discrimination, from which ruling Creasy seeks further review.

A *Batson* hearing was held on November 1, 1991, before a judge different than the one who conducted the prospective juror *voir dire*, since the original judge no longer held office. None of the trial counsel who participated in the *voir dire* was of record or participated in the *Batson* hearing. The parties through counsel stipulated that the racial makeup of the venire was as follows: 48 persons composed the venire; 11 were black, 4 were Hispanic, 30 were Caucasian and 3 were of an unrecorded race. It was further stipulated that the murder victim and attempted murder victim were white and that Creasy is a "white Hispanic." The 48 juror cards were received into evidence. The record on remand reveals that some of the "evidence" relating to a venire member's race or ethnic origin was the result of counsel's telephone conversation with that member. No witnesses were called by either side. During the *Batson* hearing it was noted that prospective juror questioning on *voir dire* was conducted principally by the court. Counsel for each party generally accepted the juror or simply excused each one with their thanks.

During the *Batson* proceedings, the circuit court (*Batson* court) summarized the evidence contained in the transcript of the original *voir dire* proceedings. The first person excused was by the defense, a white male, on a peremptory challenge. The second person was excused for cause by the court, a white female. Next, the court excused a black female for cause due to a nervous condition. The State then exercised its first peremptory challenge, excusing a white female. The court then excused a black minister for cause, because the minister was not sure that he could be a proper juror. A white female was peremptorily excused next by the defense. The court then excused a white male for cause, who stated that he would be biased if defendant failed to testify. The court next excused an Hispanic female for cause, who was unsure of her own ability to be fair. At this point, the *Batson* court observed that all those accepted by the parties as jurors, eight in number, were white and that the State had not excused any black or Hispanic venirepersons.

The *Batson* court continued its summary of the *voir dire*; omitted from its summary at this point, however, was that a person of unrecorded race was excused next for cause by the court. The next person excused, the *Batson* court noted, was a black female, the first black venireperson peremptorily excused by the State. A black male next was excused by the court for cause, because he did not think that he could be fair in a murder case. The court thereafter excused for cause a female of unrecorded race and a white male. The State followed with the next peremptory challenge and excused a black female. The

defense followed and exercised its third peremptory challenge, excusing a white male. The State next peremptorily excused a white female. The *Batson* court noted at this point that it saw little difference between any of the two white and two black veniremembers excused by the State. Next, the defense peremptorily excused a white male. The court then excused a white male for cause. The State exercised its next challenge against a black male. The next two jurors accepted were either both black, of which one was also Hispanic, or were one black and one Hispanic, respectively.[1] The jury was complete. In picking the two alternates, the court excused an Hispanic and a white venireperson, and the State and the defense each excused a white person.

The *Batson* court stated that in asking "general questions, both the defense and the State have pretty much excused people that answer the questions, general questions the same way." Based upon everything it read, the attorneys' statements, the questions and answers to the court, and the juror information cards, the court was unable to find a *prima facie* case in which the purposeful exclusion of black venirepersons was undertaken by the State in this case. The exclusion of Hispanic people was not an issue.

Creasy contends the court's finding that he failed to establish a *prima facie* case of purposeful discrimination was against the manifest weight of the evidence.

To establish a *prima facie* case of racial discrimination in the State's use of peremptory challenges, defendant must prove relevant facts and circumstances which raise an inference that the State deliberately used its peremptory challenges to exclude members of the venire for race-based reasons. (*People v. Kindelan* (1991), 213 Ill. App. 3d 548, 572 N.E.2d 1138.) The court's determination that no *prima facie* case existed will not be disturbed unless contrary to the

---

[1]Whether the eleventh juror accepted was a black Hispanic male or white Hispanic male is unclear, as seen from the following colloquy:

"[DEFENSE COUNSEL]: Theodore Gutierrez, Hispanic, he served. Black Hispanic male.

THE COURT: You're calling him a black Hispanic male?

[DEFENSE COUNSEL]: No. We don't know. He is Hispanic male.

* * *

THE COURT: So on him you don't know if he is white or black Hispanic?

[DEFENSE COUNSEL]: No.

THE COURT: You're just calling him Hispanic?

[DEFENSE COUNSEL]: Right.

THE COURT: He served. He is number eleven."

manifest weight of the evidence. (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360.) Nevertheless, Creasy urges that because the judge who decided the case on remand was not the same judge who conducted the *voir dire*, this court is in no different position to assess the evidence or credibility of the prosecutor than the circuit court. The circuit court's determination of whether a defendant has established a *prima facie* case does not turn upon an evaluation of credibility, but depends on weighing the facts and relevant circumstances. (*People v. Baisten* (1990), 203 Ill. App. 3d 64, 560 N.E.2d 1060.) Among those facts and relevant circumstances a circuit court can consider, in determining whether a *prima facie* case of intentional discrimination exists, are: (1) a disproportionate number of strikes against blacks, so as to present a pattern of peremptory challenges by the State against black venire members; (2) peremptory challenges used against venirepersons as heterogeneous as the entire community, sharing race as their only common characteristic; (3) the racial identities of defendant, the victims, and the witnesses; and (4) the level of black representation in the venire as compared to that in the jury. *People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357; *People v. McDonald* (1988), 125 Ill. 2d 182, 530 N.E.2d 1351; *Evans*, 125 Ill. 2d 50.

Relying upon the above factors, Creasy asserts that he established a *prima facie* case of discrimination. First, the State is alleged to have disproportionately exercised its challenges against black venirepersons by using three of five challenges for such exclusion.[2] Second, the three State-excused black venirepersons had in common only the facts that they were married and had no prior jury experience. Creasy urges that these common characteristics help establish the *prima facie* case because the same characteristics were shared by several of the selected jurors. Third, the level of black representation in the venire was triple that accepted to serve on the jury, allegedly further establishing Creasy's *prima facie* case. Fourth, the only black juror[3] was chosen subsequent to Creasy's *Batson* objection.

The *Batson* court here reviewed the entire jury selection process, juror by juror. The court observed that both the defense and the State generally excused people who answered questions in the same way. The court found little difference between any of the ex-

---

[2] A sixth State peremptory challenge was made to an alternate white prospective juror.

[3] See footnote 1.

cluded venirepersons, black or white, who were excused by the defense or the State, thereby neutralizing the heterogeneity factor. Lastly, the court did not believe it significant that a Hispanic person was put on the jury after Creasy made the *Batson* objection.

The instant record does not demonstrate a pattern of strikes against black veniremembers; an equal number of challenges were used by the State to exclude white venirepersons as black. At least one black person[4] served on the jury, perhaps two. Three black venirepersons were excused by the court for cause. The victims and witnesses were Caucasian, and defendant was a Caucasian Hispanic; therefore, no discrimination can be inferred from Creasy's or the victim's race. *People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234.

The heterogeneity factor in this case was neutral. Of those venirepersons peremptorily excused by the State, white and black, they generally possessed other characteristics in common. Although it may be true that the prosecution accepted white veniremembers with similar characteristics, at this *prima facie* stage of the *Batson* challenge, the court was required to be concerned only with any characteristics other than race, rather than possible reasons for the strikes or similarities between stricken black and accepted white veniremembers. (*People v. Henderson*, 142 Ill. 2d at 289-90.) A *prima facie* case cannot be established solely on the number of black venirepersons challenged (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 539 N.E.2d 1172).

From the foregoing, the circuit court's finding that no *prima facie* case existed was not against the manifest weight of the evidence.

Affirmed.

SCARIANO and DiVITO, JJ., concur.

---

[4]See footnote 1.