THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFF FORT *et al.*, Defendants-Appellants.

First District (5th Division) Nos. 1—88—3632, 1—88—3635, 1—88—3636, 1—89—0220 cons.

Opinion filed June 4, 1993.—Rehearing denied July 7, 1993.

Rita A. Fry, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Judy L. DeAngelis, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendants Jeff Fort, Derrick Kees, Ray Ferguson and William Doyle were convicted of the murder of Willie Bibbs. Defendant Fort was sentenced to 75 years, defendants Kees and Doyle were sentenced to 55 years and defendant Ferguson was sentenced to natural life imprisonment. Defendants appeal their convictions and sentences.

The following issues are raised on appeal: (1) whether the prosecution purposefully used its peremptory challenges to exclude black venirepersons from the jury; (2) whether the trial court erred in denying defendants' motions for change of venue; (3) whether the trial court improperly denied defendant Fort's challenges for cause as to those prospective jurors who knew of Fort's prior conviction or who were exposed to pretrial publicity on Fort; (4) whether the trial court erred in failing to ask during *voir dire* certain questions proposed by defense counsel; (5) whether defendants were restricted in presenting their defense that somebody other than defendant murdered Willie Bibbs; (6) whether defendants were improperly restricted in their cross-examination of Earl Hawkins; (7) whether it was improper for the trial court to allow detailed testimony concerning the El Rukn gang; (8) whether the accomplice testimony of Anthony Sumner and Earl Hawkins was sufficient to prove defendants Kees, Doyle, and Ferguson guilty beyond a reasonable doubt; (9) whether the prosecutor made improper comments in closing argument; (10) whether the trial court erred in refusing to allow defendants Kees and Doyle to inspect their presentence reports three days prior to imposing sen-

tence; and (11) whether the trial court improperly imposed extended-term sentences on defendants Fort, Kees and Doyle.

The relevant facts are as follows. On June 14, 1981, around midnight, Willie Bibbs was gunned down as he stood outside the Fountainhead lounge at 114 E. 43rd Street in Chicago. Bibbs died from two gunshot wounds. Six expended shell casings from a .38-caliber weapon were found near the scene. Gregory Hollis was also in front of the lounge at that time and saw a man pacing up and down 43rd Street, by the passenger side of his car. Hollis saw the man look towards the lounge and nod his head. Hollis looked to see what the man was nodding at and saw three men exit the alley wearing ski masks and carrying guns. Hollis shouted a warning to Bibbs, and as Hollis was driving off, he saw one of the men wearing a ski mask point a gun at Bibbs and he heard five or six shots fired. As Hollis drove around the block he saw two old, dark-colored cars emerge from the other end of the alley. Hollis later identified Earl Hawkins as the man he saw pacing across the street from the Fountainhead lounge. Hollis knew that Bibbs sold drugs and that Bibbs owed another drug dealer money.

Emanuel Slaughter was also sitting in his car outside the lounge when Bibbs was shot. Slaughter also noticed a man, who he later identified as Earl Hawkins, pacing across the street. He looked to see what the man was looking at and saw two men come out of the alley and he then heard five or six shots being fired.

On October 9, 1981, Earl Hawkins was arrested and charged with the murder of Willie Bibbs. Hawkins was tried and acquitted of the murder.

In 1985, Anthony Sumner, Earl Hawkins, J.L. Houston, Alvin Toney, and James Walker were found in an El Rukn safe house in Cleveland. The police arrested Houston and Walker on outstanding warrants and took them and Sumner back to Chicago. Sumner implicated himself in the Bibbs murder and another double murder. Later, Sumner was charged in the double homicide and subsequently made arrangements with the State's Attorney's office to testify against various members of the El Rukn street gang. Sumner told police that Fort was the leader of the El Rukns and that Fort ordered six of his men to shoot up 43rd Street. According to Sumner, Fort was upset because the Titanic Stones were selling drugs on 43rd Street without giving any money to the El Rukns. Fort was also upset because the Titanic Stones refused to drop the word Stones from their name. The El Rukns were previously known as the Blackstone Rangers and Fort did not want anybody using "Stones" as part of their name.

In 1987, after Hawkins was sentenced to death for his involvement in a double homicide and on death row, Hawkins wrote a letter to Detective Brannigan in which Hawkins offered to help Brannigan if Brannigan would help him. Hawkins, like Sumner, claimed that Fort ordered the shooting at the Fountainhead lounge because the Titanic Stones had refused to comply with Fort's requests to kickback money and to stop using the name Stones. Hawkins claimed that a meeting was held in Fort's apartment on the evening of June 14, 1981, and the plan was made to shoot up 43rd Street. Hawkins claimed that all of the defendants were present at the meeting. At this meeting, it was decided that Derrick Porter and Sumner were to drive cars, one with the shooters in it, the other with guns locked in the trunk. Kees and Doyle were to get handguns from the car trunk once they reached the alley near the lounge, and Ferguson was to use a machine gun. The men with the guns were to set up a crossfire and shoot into the lounge area. Hawkins was to act as the lookout. Hawkins would signal to the shooters and they would open fire on the lounge and anyone near it. Everyone, except Hawkins, was to wear a ski mask. Hawkins was to use Fort's gun to shoot at the police if any came by before the other El Rukns had completed their assignments.

Hawkins claimed that the plan initially went as planned. Hawkins and Sumner drove to a location near the lounge, and Hawkins got out and took his lookout position. Porter and Sumner then dropped off Kees, Doyle, and Ferguson. The shooters walked down the alley, Kees and Doyle with handguns and Ferguson with a machine gun. Kees then peeked around the corner of the building to the east of the lounge where the alley and the sidewalk intersect, saw Bibbs and fired five or six shots. Hearing the shots, the others abandoned their plan and ran away. Hawkins claimed that Kees fired all the shots from the same spot.

Former El Rukn Trammel Davis also confirmed that a meeting was held at Fort's apartment on the night Bibbs was murdered and that after the meeting Doyle, Kees, and Ferguson left with guns.

Based on this information defendants were arrested, tried and convicted. All defendants appeal.

We first address the contention, raised by all defendants, that the prosecution improperly used its peremptory challenges to exclude black venirepersons from the jury. In order to prevail on a claim of unconstitutional discrimination in the exercise of peremptory challenges, a defendant must establish a *prima facie* showing of purposeful discrimination. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct 1712.) A *prima facie* case of purposeful discrimina-

tion is established when defendant shows that the prosecutor exercised peremptory challenges to remove venirepersons of a cognizable racial group and that relevant circumstances create an inference of discrimination in the exclusion of venirepersons based on race. (*People v. Edwards* (1991), 144 Ill. 2d 108, 579 N.E.2d 336.) Relevant circumstances include a pattern of strikes against black venirepersons, the prosecutor's questions and statements during *voir dire* and in exercising his challenges, whether there has been a disproportionate use of peremptory challenges against blacks, whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic, the level of black representation in the venire as compared to the jury, the race of the defendant and the victim, and the race of the witnesses. (*People v. Lovelady* (1991), 221 Ill. App. 3d 829, 582 N.E.2d 1217.) The trial court's determination that a defendant failed to establish a *prima facie* case will not be overturned unless it is against the manifest weight of the evidence. *People v. Batchelor* (1990), 202 Ill. App. 3d 316, 559 N.E.2d 948.

Initially, we reject the State's contention that defendants waived the right to raise this issue since they failed to make a proper record as to the number of black veniremembers excluded and included in the jury. Although there is some disagreement between the parties as to the exact number of blacks in the venire, the trial court, in order to make a proper record, specifically stated the number of blacks in the venire and the number of black jurors selected. The State at no time disagreed with these figures. Accordingly, we proceed to the merits of this issue.

■ In arguing to the trial court that the prosecutor purposefully excluded blacks from the jury, defense counsel relied exclusively on the number of peremptory challenges used by the prosecutor to exclude blacks, arguing that a disproportionate number of peremptory challenges were used against blacks. It is clear that the mere number of black veniremembers peremptorily challenged, without more, will not establish a *prima facie* case of discrimination. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 539 N.E.2d 1172.) The trial court found that no *prima facie* case of discrimination had been established based on the fact that five blacks (four jurors and one alternate) had been chosen out of 15 blacks on the venire. The record also reveals that 10 of the State's 24 peremptory challenges were used on blacks and 14 were used on whites. Accordingly, because defense counsel pointed to no circumstances showing purposeful discrimination except for the number of excluded black veniremembers, the trial court did not

abuse its discretion in determining that defendants had failed to established a *prima facie* case of purposeful discrimination.

Defendants next argue that the trial court improperly denied their motions to change venue based on the pervasive pretrial publicity on defendant Fort. Defendant Fort claims that for the past two decades he had been the subject of extensive publicity as being the leader of Chicago's most notorious street gang and because of this publicity, the trial court's *voir dire* was futile. Defendants Kees, Doyle and Ferguson claim that because of the publicity on Fort, the trial court should have granted their motions for change of venue or severance.

A defendant is entitled to a change of venue as a result of pretrial publicity if there is a reasonable apprehension that the defendant cannot receive a fair and impartial trial. (*People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645.) Jurors need not be totally unaware of a case for a defendant to receive a fair trial. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) Accordingly, a change of venue should be granted only when it becomes apparent that it will not be possible to find 12 jurors sufficiently unfamiliar with the case to withstand a challenge for cause. (*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) The decision whether to grant a change of venue is within the trial court's discretion and will not be reversed absent an abuse of that discretion. *People v. Knippenberg* (1979), 70 Ill. App. 3d 496, 388 N.E.2d 806.

■ The trial court in the instant case recognized that Fort had received substantial publicity. Consequently, the court questioned the venirepersons in order to determine the impact of the publicity and noted that if it was revealed during *voir dire* that it was impossible to pick an impartial jury, the case would be moved to a different county. The total venire consisted of 335 prospective jurors. Of the 198 veniremembers excused for cause, 141 were excused because of their fixed opinions regarding defendant Fort and the El Rukns. (See *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208) (large number of venirepersons excused for cause demonstrates that trial court exercised care in assuring that defendant was tried by a fair and impartial jury).) A review of the *voir dire* reveals that while practically all of the jurors had heard of defendant Fort and the El Rukns, the 12 jurors and two alternates selected had little if any knowledge pertaining to the details of the Bibbs murder. In addition, they stated that they could set aside the information they had heard about Fort from the

media and could render a verdict based solely on the evidence. See *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362.

Although one juror initially expressed uncertainty about his ability to be impartial due to media reports of defendant Fort and the El Rukns, upon further inquiry by the court, he stated that he would try to be as objective as possible, that it was the State's burden to prove defendants guilty, that he had no opinion as to defendant's guilt and that he would decide the case based solely on the evidence. The trial judge was in the best position to evaluate this response and fairly decide its candor. (*People v. Tipton* (1991), 222 Ill. App. 3d 657, 584 N.E.2d 316.) We do not believe that the trial court abused its discretion in finding that juror capable of rendering a fair and impartial verdict. Accordingly, the trial court did not abuse its discretion when it denied defendants' motions for change of venue since the trial court was able to find 12 people who were able to serve as fair and impartial jurors.

■ We also find that the trial court acted properly in denying the motions by defendants Kees, Doyle and Ferguson requesting to be tried separately from defendant Fort. Generally, defendants indicted together are to be tried together unless separate trials are required to avoid prejudice. (*People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349.) It is within the trial court's sound discretion whether to grant a motion to sever, and this court will not reverse unless there has been an abuse of discretion. (*People v. Olinger* (1986), 112 Ill. 2d 324, 493 N.E.2d 579.) The mere anticipation of prejudice is not sufficient to warrant a severance. Instead, severance is appropriate where codefendants' defenses are so antagonistic that a joint trial could not be fair or where the State introduces out-of-court statements of a nontestifying codefendant that implicate the defendant. (*People v. Wilson* (1987), 161 Ill. App. 3d 995, 515 N.E.2d 812.) Even if we were to determine that pretrial publicity relating only to Fort is a sufficient reason to sever the trial of defendants Kees, Doyle and Ferguson from that of Fort, we would still decline to reverse the trial court's decision denying severance. Because we determined that Fort was able to receive a fair trial despite the publicity he received, we also conclude that the other defendants were able to receive a fair trial and were not prejudiced by the fact that they were tried with defendant Fort.

■ Defendant Fort next contends that the trial court improperly denied his challenges for cause as to those prospective jurors who knew of his prior convictions. Defendant claims that because of the trial court's denial, he was forced to use peremptory challenges to discharge the jurors who knew of such convictions and was forced to ac-

cept certain jurors because he had exhausted his peremptory challenges. A decision to grant challenges for cause or a request for additional peremptory challenges rests within the sound discretion of the trial court. (*People v. Pecina* (1985), 132 Ill. App. 3d 948, 477 N.E.2d 811.) That discretion was not abused here. After reviewing the *voir dire* of the two venirepersons defendant was allegedly forced to peremptorily challenge and the three jurors defendant was allegedly forced to accept, it is apparent to us that these veniremembers were properly not dismissed for cause. The court conducted extensive *voir dire* for the purpose of getting "out in the open" exactly what each prospective juror knew and whether he or she would be able to set aside that knowledge and base his or her decision solely on the evidence presented at trial. Although these venirepersons knew that defendant had been in jail or convicted, they did not know what the previous charges against defendant were and they stated that their knowledge would not affect their ability to be impartial. (See *Murphy v. Florida* (1975), 421 U.S. 794, 44 L. Ed. 2d 589, 95 S. Ct. 2031 (wherein jurors had vague recollections of defendant's past crimes but found the prior offenses irrelevant, court noted the distinction between mere familiarity with a defendant's past and an actual prejudice against him); *People v. Tucker* (1990), 193 Ill. App. 3d 849, 550 N.E.2d 581 (juror in defendant's drunk driving trial properly found fair and impartial where she stated her knowledge that defendant had other alcohol-related convictions would not affect her impartiality).) We are not persuaded by the cases cited by defendant Fort, *Marshall v. United States* (1959), 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171, and *People v. Edwards* (1976), 63 Ill. 2d 134, 345 N.E.2d 496, since the jurors in those cases knew specific details of the defendant's prior convictions. We therefore conclude that the trial court did not abuse its discretion in believing that the jurors could evaluate this case strictly on the evidence presented at trial.

■ In a similar argument, defendant Fort next contends that the trial court improperly denied his challenges for cause as to certain prospective jurors who were exposed to pretrial publicity regarding Fort. Again, a careful review of the *voir dire* of the five individuals defendant Fort claims should have been excused for cause reveals that the trial court did not abuse its discretion when it determined that these individuals could be fair and impartial. While each of these five jurors initially may have given equivocal answers regarding his or her ability to be fair based on the information received on defendant from the media, what is significant is the fact that these individuals each said that it was the State's burden to prove defendant guilty and

that he or she could set aside the information received from the media and render a decision based solely on the evidence presented at trial. See *People v. Goff* (1985), 137 Ill. App. 3d 108, 484 N.E.2d 414.

■ Defendant Fort next maintains that it was error for the trial court to refuse to ask the venirepersons the following supplemental *voir dire* question:

> "Can you promise that you can completely put aside anything you have read or heard about defendants and/or this case and render a verdict based solely on the evidence?"

The trial court refused to ask this question, stating that although it would not follow any strict format, it would ask the jurors whether they could decide the case based solely on the evidence presented at trial and if they could set aside any opinions they may have. While the trial court did not ask defendant's supplemental question verbatim, the court did indeed ask the venirepersons whether they could set aside the information they received from the media and render an impartial decision. Clearly there was no abuse of discretion here.

■ Defendant Fort's next contention is that the trial court erred in refusing to ask supplemental *voir dire* questions relating to racial prejudice. Specifically, defendant wanted the court to ask whether the jurors thought that blacks were more likely than whites to commit crimes and whether the jurors had any racial animosities. We do not believe that the trial court abused its discretion in refusing to ask this supplemental question since there were no racial overtones in this case, and to ask these questions may have served to inject racial prejudice where none previously existed. See *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 68 L. Ed. 2d 22, 101 S. Ct. 1629.

■ We likewise find no merit to defendant Fort's contention that the trial court failed to ask juror Sally Bradley follow-up questions which would have revealed her incompetency to act as a juror in this case. Ms. Bradley's responses to questioning during *voir dire* indicated that she was an impartial juror and that she was competent to serve as a juror. In fact, at the conclusion of Bradley's *voir dire* defendant neither challenged her for cause nor asked the court to inquire further of Bradley. Later, defendant asked the court to "reconsider" Bradley because some of the defense counsel believed her to be incompetent. The court stated that it found no indication that she was incompetent. The next day, however, Chief Waldron of the sheriff's office informed the court that Bradley had engaged in strange behavior the previous night and that she was illiterate. The court then excused Bradley and she was replaced by the first alternate. Certainly defendant Fort cannot now assert that the trial court should have asked

Bradley supplemental questions when defendant never requested that the court ask Bradley any further questions. Additionally, as a review of Bradley's questioning on *voir dire* reveals, there was nothing in her answers to indicate that she was incompetent to serve as a juror. The court had no reason to believe Bradley was incompetent until it was informed of her erratic behavior the next day by Chief Waldron.

Defendants Kees, Doyle and Ferguson next contend that their convictions should be reversed since they were based on the testimony of Earl Hawkins and Anthony Sumner, both of whom were accomplices. It is well established that a conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.) It must be determined whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) The uncorroborated testimony of an accomplice can be sufficient to sustain a conviction where the jury is convinced of the defendant's guilt beyond a reasonable doubt. (*Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.) The testimony of an accomplice witness has inherent weaknesses since the accomplice may have been promised leniency in exchange for his testimony. (*People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375.) The ultimate determination of whether such testimony is sufficient to base a conviction is for the jury, which is entrusted with the task of assessing the credibility of the witnesses and the weight afforded their testimony. *People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247.

■ The jury in the instant case was fully aware of the weaknesses in the testimony of Hawkins and Sumner. The jury was informed that Hawkins and Sumner not only were accomplices in this case but had prior criminal backgrounds. The jury was aware that Hawkins hoped to benefit from his testimony. The jury also knew that in exchange for Sumner's testimony, a separate murder charge against him was dismissed and he was not charged with the Bibbs murder. Defendants were afforded ample opportunity to impeach Hawkins and Sumner. Despite this impeachment, the jury still found Hawkins and Sumner credible. (See *People v. Fields* (1990), 135 Ill. 2d 18, 552 N.E.2d 791 (wherein the defendant also argued that Sumner's testimony was unworthy of belief because he testified in exchange for the dismissal of a double charge against him and the court held that the evaluation of Sumner's credibility was best left to the jury).) Furthermore, the jury was instructed that, "When a witness says he was

involved in the commission of a crime with a Defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution." (See *People v. Roy* (1988), 172 Ill. App. 3d 16, 526 N.E.2d 204.) We cannot say that the jury's conclusion was unreasonable, improbable, or unsatisfactory and therefore conclude that the evidence was sufficient to prove defendants guilty beyond a reasonable doubt.

All the defendants next argue that the trial court improperly limited proof that someone other than defendants murdered Willie Bibbs. It is well settled that an accused may attempt to prove that someone else committed the crime with which he is charged. (*People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) However, if the evidence is too remote or too speculative, or if it fails to link a third person with the commission of the crime, then the trial court should exclude the evidence. (*People v. Bruce* (1989), 185 Ill. App. 3d 356, 541 N.E.2d 708.) The determination whether to admit evidence rests within the sound discretion of the trial court. *Bruce*, 185 Ill. App. 3d 356, 541 N.E.2d 708.

■■ Defendants attempted to establish that someone named "Duke" killed Bibbs because Bibbs owed "Duke" money but refused to pay him. Our review of the record reveals that no evidence was presented to establish Duke's identity, his presence at the scene of the murder, or his involvement in the murder. As the State points out, courts have disallowed evidence of another's involvement in the crime even in instances where the evidence is less remote than that presented here. (See *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590) (trial court properly refused to admit testimony that several months before the murder, someone had fired a blank cartridge in the victim's direction, burned the victim's jacket, and told the victim that he should have his "block knocked off").) Accordingly, the evidence linking Duke to Bibbs' murder was too remote and speculative and therefore was properly denied by the trial court.

Defendants further contend that they were improperly restricted in their cross-examination of Earl Hawkins. Defendants complain that they were improperly precluded from questioning Hawkins about the specifics of his prior murder conviction and another double homicide that had been nol-prossed. The scope of cross-examination concerning the circumstances of a witness' prior conviction is within the trial court's sound discretion, and absent an abuse of that discretion, the ruling will not be reversed on appeal. *People v. Boclair* (1989), 129 Ill. 2d 458, 544 N.E.2d 715.

■■ Defendants were permitted to elicit from Hawkins that he had been sentenced to death for a double murder and the fact that Hawkins testified in order to benefit himself. The trial court, however, properly determined that defendants were not entitled to elicit the details of the double murder since that crime is unrelated and irrelevant to this crime. See *People v. Boclair* (1989), 129 Ill. 2d 458, 544 N.E.2d 715 (trial court properly limited scope of cross-examination of State witnesses to the date and nature, but not the circumstances, of the witness' prior murder).

■■ Defendant Fort, in turn, argues that Hawkins should not have been allowed to testify at all because he invoked his fifth amendment rights when asked certain questions. On cross-examination, Hawkins was asked whether he was in Cleveland in 1985. Initially, Hawkins answered that he was in Cleveland in 1985, but when defense counsel repeated the same question, Hawkins refused to answer because his response may impact his appeal. Under these circumstances, it was proper for Hawkins to testify since he only refused to answer one question which would incriminate himself and he did in fact answer the question when it was initially asked.

Defendants all contend that it was improper for the trial court to allow detailed testimony regarding the El Rukn street gang. Courts recognize that, particularly in metropolitan areas, there may be a strong prejudice against street gangs. (*People v. Parrott* (1976), 40 Ill. App. 3d 328, 352 N.E.2d 299.) Despite this fact, evidence of gang affiliation, if relevant to the crime, is generally admissible even though it may prejudice the defendant. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 570 N.E.2d 344.) Evidence showing that defendant was a member of a gang or involved in gang-related activity is admissible to provide a motive for an otherwise inexplicable act. *People v. Johnson* (1991), 218 Ill. App. 3d 967, 578 N.E.2d 1274.

■■ In the instant case, evidence of defendants' gang affiliation was indeed relevant since the evidence reveals that the killing of Willie Bibbs was motivated by a territorial feud between defendants' gang, the El Rukns, and the victim's gang, the Titanic Stones. Defendants also argue that Davis, Sumner, and Detective Brannigan gave unnecessary detail into the history and structure of the El Rukns. Evidence of gang history and structure is admissible when relevant. (See *People v. Suarez* (1991), 238 Ill. App. 3d 110, 606 N.E.2d 1237 (testimony providing insight to the gang structure in Chicago and to the behavior of such gangs was admissible because it was relevant to the crime charged).) Here, we determine that the information Sumner, Davis, and Hawkins presented regarding the details of the El

Rukn infrastructure was relevant to their knowledge and involvement in the murder. Furthermore, despite defendants' contentions to the contrary, a police officer's testimony regarding gang activity is proper when the officer's testimony qualifies as expert opinion, the testimony is relevant, and the probative value of the testimony outweighs its prejudicial effect. (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207 (an officer would have a better opportunity than a layperson to observe and learn about the detailed hierarchy and activities of street gangs).) The police officer in *People v. Langford* (1992), 234 Ill. App. 3d 855, 602 N.E.2d 9, was determined to be an expert since he had worked as a gang crimes specialist for 10 years and was assigned to the area where the murder occurred. Similarly, in *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207, the officer qualified as an expert in light of his five years' experience investigating, observing and infiltrating gangs.

The officer in the instant case, Officer Brannigan, was a Chicago police officer in the gang crimes unit. He was assigned to the Organized Crime Task Force through the Bureau of Alcohol, Tobacco, and Firearms. His main assignment was to investigate the El Rukns and he had been investigating the El Rukns since 1978. He monitored the El Rukns through surveillance, contact with informers, speaking with members who were willing to talk, and speaking with other law enforcement officers. Certainly, Brannigan was qualified to give expert testimony as to the hierarchy of the El Rukns.

Defendants next maintain that the trial court erred when it allowed testimony that arrest warrants had been issued for defendants. Defendants claim such testimony improperly enhanced the credibility of police officer Murphy by proving he made statements consistent with his trial testimony. Officer Murphy testified as to his investigation into the Bibbs murder. He explained that after interviewing Earl Hawkins and Trammel Davis he obtained arrest warrants for defendants. He then explained that the arrest warrants were served and defendants were arrested. The police officer in *People v. Hayes* (1990), 139 Ill. 2d 89, 564 N.E.2d 803, gave similar testimony that an arrest warrant was issued for the defendant's arrest and that defendant was later arrested after a four-day stakeout. The court found:

> "The issuance of a warrant for the defendant's arrest was part of the narrative of police activities leading to the defendant's arrest and was intertwined with the circumstances of the arrest. Testimony that an arrest warrant was issued was there-

fore properly admitted." (*Hayes*, 139 Ill. 2d at 136, 564 N.E.2d at 823.)

We likewise conclude that the testimony of Detective Brannigan as to his investigation into the murder of Willie Bibbs and the subsequent arrest of defendants was properly admitted.

 We next address defendant Fort's argument that the trial court allowed the State to improperly rehabilitate Detective Dwyer, Lieutenant Murphy and Detective Brannigan. In defendant's three-sentence argument on this point, defendant neither directs us to the relevant portion of the record nor explains why he believes that the rehabilitation was improper. (See *Williams v. Danley Lumber Co.* (1984), 129 Ill. App. 3d 325, 472 N.E.2d 586 (reviewing court is entitled to have the issues clearly defined with pertinent authority cited and comprehensive legal argument presented).) Accordingly, we consider this issue waived since it has not been adequately presented.

 Defendants next argue that the prosecutor made prejudicial comments in closing argument. Defendants specifically argue that the prosecutor: (1) improperly commented on defense counsel's views of the State's evidence; (2) misstated the evidence; and (3) improperly emphasized the violent nature of the El Rukn street gang. Defendants first take issue with the prosecutor's comment:

"They want you to deflect everything you've heard away from these five guys because they know that's the only way they can win the case, they know that the evidence from the box is overwhelming against their clients."

Defendants contend that the prosecutor's comment portrayed defense counsel as being in agreement with the State on the extent of the State's proof. (See *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.) While we find that the prosecutor's comment was improper, we decline to reverse on this basis. Reversible errors occurs only when the prosecutor's remarks substantially prejudiced the defendant or in other words, were it not for the remarks, the verdict would have been different. (*People v. Salazar* (1991), 211 Ill. App. 3d 899, 570 N.E.2d 802.) It is our conclusion that even if this comment had not been made, the jury still would have found defendants guilty.

Defendants next claim that the prosecutor misstated the evidence when he commented:

"And remember what Earl Hawkins said about that machine gun that everybody makes a big deal of. Earl Hawkins said that he saw Ferguson coming up the alley, Ferguson was trying to get the machine gun out of the bag."

Defense counsel objected on the basis that Hawkins never made that statement. The court responded that the jury heard the evidence and will determine the outcome of the case from the evidence. Later, the jury was instructed that any statement made in closing argument that is not supported by the evidence must be disregarded. The State concedes that the prosecutor's comment was not supported by the evidence. However, based on the overwhelming evidence against defendants and the instruction given to the jury, we do not find the comment so prejudicial as to require a new trial. See *People v. Beamon* (1991), 213 Ill. App. 3d 410, 572 N.E.2d 1011.

Defendants next contend that the prosecutor improperly commented on the evil nature of the El Rukn street gang, thereby encouraging the jury to convict on the basis of defendants' general criminal nature rather than because they were guilty of the crime charged. Specifically, the prosecutor commented that the jury had seen how the El Rukns and Jeff Fort have held the city hostage through the sale of drugs, and fear and intimidation of coming forward. The prosecutor further asked the jury why Emanuel Slaughter would give false testimony when "he's got to go back out there on the street, he's got to go back out there where these people prowl and murder."

■■ It is well settled that while a prosecutor may not make statements solely to inflame the passions or arouse the prejudice of the jury, the prosecutor may comment upon the evil results of crime and the benefits of a fearless administration of the law. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.) The prosecutor may also comment on the results of the crime and its effects on the community. (*People v. Johnson* (1979), 73 Ill. App. 3d 431, 392 N.E.2d 587.) We find that the comments here were properly based on the evidence which showed that Willie Bibb was gunned down because he was part a gang which sold drugs in an area the El Rukns sought to control. Furthermore, Emanuel Slaughter and Gregory Hollis testified that they originally lied about their knowledge of El Rukn involvement in Bibbs' murder because they felt threatened and were in fear of the El Rukns. A prosecutor may properly argue that defendant engendered fear in the witnesses when it is based on the evidence. (*People v. Brandon* (1990), 197 Ill. App. 3d 866, 557 N.E.2d 1264.) Here, the prosecutor properly commented on the evidence.

Next, defendants Kees and Doyle contend that they are entitled to new sentencing hearings because they did not receive presentence reports three days before sentencing as required by section 5—3—4(b)(3) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38,

par. 1005—3—4(b)(3)). The section provides that a presentence report shall be open for inspection at least three days prior to the imposition of sentence, unless the three days are waived. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—3—4(b)(3).) The presentence report need not be tendered to defense counsel three days before the sentencing hearing. (*People v. Stewart* (1984), 101 Ill. 2d 470, 463 N.E.2d 677.) Section 5—3—4(b)(3) requires only that the report be open for inspection, suggesting that the attorney must make a request to inspect the report. *People v. Grant* (1979), 70 Ill. App. 3d 268, 387 N.E.2d 1026.

 The trial court noted that the sentencing date had been set for a month, the sentencing date was agreeable to all counsel and there was no indication that Kees or Doyle requested to inspect the reports three days before the hearing. In fact, we have no reason to believe that the report was not open for inspection three days before the sentencing hearing. Furthermore, even assuming the reports were not available for inspection three days before sentencing, defendants Doyle and Kees have not persuaded us that they were prejudiced by the late notice. Defendant Doyle informed the trial court that his sentencing report was incomplete. Defendant Doyle was, however, given the opportunity to orally inform the court of the missing information. Defendant Kees also argues on appeal that his report contained incomplete mitigating material. Nonetheless, defendant Kees apparently did not make that argument to the trial court. Accordingly, we see no reason to remand this case for resentencing.

 Lastly, defendants Fort, Kees and Doyle maintain that they were improperly sentenced to an extended term. We completely disagree. A trial court may sentence a defendant to an extended term "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2).) The trial court's decision is entitled to great weight and deference and will only be reversed if it is manifestly erroneous. *People v. Benkowski* (1991), 215 Ill. App. 3d 615, 575 N.E.2d 587.

Before imposing sentence, the trial court stated:

"In the case at bar, what the evidence does disclose is a motive arising from a territorial dispute over drug distribution, and the use of the names Stones. The order of Mr. Fort to get the swords, yes, it was premeditated, but more because ruthlessness was certainly envisioned, ruthlessness to the extent of the systematic liquidation of persons who might be out on 43rd Street, not limited to drug dealers alone or drug pushers, but

to anybody, including the police as well for which a special weapon was supplied. And as to the manner of execution would, could scarcely not conclude that it was flagrantly criminal, masked hunters hiding in shadows, stalking their prey, cold-blooded, without any doubt."

In light of the fact that defendants would have shot anybody, even a police officer, the trial court certainly was justified in finding that defendants' actions were premeditated, ruthless and cold-blooded, thereby warranting an extended-term sentence.

Accordingly, based on the reasons set forth above, we affirm defendants' convictions and sentences.

Affirmed.

GORDON, P.J., and MURRAY, J., concur.