THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EMMITT WEATHERSPOON, Defendant-Appellant.

First District (3rd Division)    No. 1—06—3174

Opinion filed September 9, 2009.—Rehearing denied September 1, 2009.

Michael J. Pelletier, Patricia Unsinn, and Susan-Amanda Ingram, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. People v. Weatherspoon

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

After a jury trial, defendant, Emmitt Weatherspoon, was convicted of first-degree murder and sentenced to 45 years' imprisonment. On appeal, defendant argues that (1) the trial court interfered with his right to testify when it deferred ruling on his motion *in limine* to bar the State from the introduction of one of his prior convictions until he testified; (2) he was denied his right to present a defense when he was not permitted to testify about a conversation he had with the victim's brother that caused him to leave town; (3) a detective's testimony regarding a DNA analysis implied that defendant's DNA was on file at the state crime lab as a convicted felon; (4) the State's comments in closing arguments only served to inflame the passions of the jury; and (5) the trial court erred when it refused to give defendant three days to review his presentence investigation report.[1]

## I. FACTS

Defendant was charged with aggravated criminal sexual assault and first-degree murder after Sylvia Chambers was found dead in a garbage can in the alley behind defendant's home.

### A. Motion *in limine*

Before trial, which began August 1, 2006, defendant made an oral motion *in limine* to bar the State from presenting his theft conviction from 1997. The trial court found the motion premature and ruled that it would determine the relevancy of defendant's conviction if and when defendant testified.

Defendant testified on his own behalf at the trial. Afterward, the State sought to admit defendant's convictions for robbery and theft. Defendant was convicted of robbery on July 21, 1995, and his probation was terminated in April 1997. He was convicted of theft on April 17, 1997. Defendant requested that both convictions be barred because

---

[1]On March 25, 2009, the Illinois Supreme Court vacated our previous order filed November 26, 2008, with directions to reconsider our ruling in light of *People v. Patrick*, 233 Ill. 2d 62 (2009), to determine if a different result is warranted. *People v. Weatherspoon*, 231 Ill. 2d 686 (2009). We now proceed under that directive.

they were more prejudicial than probative, especially given the remoteness of the robbery conviction.

The trial court determined that both cases affected defendant's credibility. Although both convictions "tend not to be recent," the court noted that defendant was outside the jurisdiction from 2001 through 2004. Furthermore, where defendant was being tried for crimes of violence, the theft and robbery convictions "lack any similarity to what is before this jury." After balancing the probative value of the convictions against the danger of unfair prejudice, the trial court permitted the State to present evidence of the convictions.

## B. Evidence Presented at Trial

Chambers was last seen alive on July 21, 1999, at 12:30 a.m., when she sat in a car, drinking with her friend. The next morning, her body was discovered in a garbage can in the alley behind 1145 West 112th Place in Chicago. While the police were investigating and processing the scene, neighbors saw defendant in the alley, sitting on the back of a paddy wagon.

Brian Smith, a forensic investigator for the Chicago police, testified that the body was wrapped in black sheeting. He also discovered a purple towel, which was in the alley, and a pair of pliers and a blue plastic bag, which were in the front yard of 11257 South Racine.

Detective Steven Brownfield testified that on July 22, 1999, after speaking to a witness, he went to 11254 South May looking for defendant, but no one was there. The next day, the police executed a search warrant on the house. In the rear bedroom, they found several knives lying around and a belt that had blood on its buckle. The bedsheets were "quite soiled" and appeared to be stained. They put a "stop order" on defendant but were unsuccessful in locating him.

Five years later, in November 2004, Chicago police officer Ted Przepiora was working on the Chambers case with the cold case squad. He testified that on November 3, 2004, he talked to Tanis Wildhaber of the State Police crime lab concerning the work up of evidence recovered during the investigation. Przepiora testified that Wildhaber gave him "some information about some positive findings on some DNA analysis." Based on that information, he "further investigate[d] a possible location of a suspect," *i.e.*, defendant, in Grand Rapids, Michigan. He contacted the Michigan Federal Bureau of Investigation task force, and on November 8, 2004, he, an assistant State's Attorney, and other detectives traveled to Grand Rapids.

Grand Rapids police officer Daniel Lubbers testified that on November 9, 2004, he went to defendant's place of employment and arrested him. He transported defendant to the police station and

contacted the Chicago police detectives to inform them that defendant was in custody. The detectives arrived at the police station at 9:30 or 9:45 a.m.

Przepiora and another detective spoke to defendant in an interview room almost immediately after arriving. They read defendant his *Miranda* rights, which he said he understood. Przepiora told him that they were investigating the murder of Sylvia Chambers, which occurred on July 21, 1999. At first, defendant denied involvement and claimed that he had left the Chicago area in 1998. However, after officers confronted him with crime scene photos, which showed that he was there, and witness statements that placed him at the scene the day of the murder, defendant said that his and the victim's DNA would be found in his bedroom. Defendant told Przepiora that he and Chambers agreed to smoke crack cocaine in exchange for sex. He purchased two bags of rocks from the dealer down the alley, returned to his bedroom, and smoked the cocaine with Chambers. He then had sex with Chambers, during which time he ejaculated on her chest. Afterward, Chambers, dressed only from the waist up, demanded more cocaine, but he refused and asked her to leave. She became enraged, and a struggle ensued.

As Chambers struggled with defendant, he removed his belt, put it around her neck, and twisted it. Chambers continued to struggle; he released the belt and put his hands around her neck. He then reached for a Swiss Army knife and stabbed her in the neck. After he stabbed her, she began gasping for air and died a short time later. Defendant got black landscaping plastic from the kitchen and wrapped Chambers's body in it. He placed her body in a garbage can in the alley behind his house. When he returned to the house, he wrapped the knife he used to stab Chambers in her pants and then put the pants in a television cabinet in the basement of the house.

When the police arrived, he went outside and watched them process the scene. After the police left the area, he approached his sister Shalonda and told her he had been involved in a murder. He asked her to drive him to Altgeld Gardens, where he stayed for one or two days. He then drove to his sister Nicole's house in Grand Rapids. Nicole confronted him with the fact that he showed up at her door with only the clothes on his back, and he confided that he had been involved in a murder in Chicago and could not return.

During Przepiora's conversation with defendant, he showed him pictures of the scene. Defendant identified the belt he used on Chambers.

After his discussion with defendant, Przepiora left the room and informed Assistant State's Attorney Rob Robertson of defendant's

statement. Robertson, the detectives, and defendant moved to a larger conference room, where Robertson also advised defendant of his rights.

Robertson testified that after the detectives interviewed defendant, they informed him that defendant agreed to talk to him. Robertson advised defendant of his constitutional rights, which defendant said he understood. After defendant talked to Robertson about the murder of Sylvia Chambers, Robertson explained the ways that defendant could memorialize his statement. Defendant chose to give a videotaped statement, so defendant, Robertson, and the detectives signed the consent form.

In the videotaped statement, defendant said that the murder had been weighing on his mind for five years. He stated that on July 21, 1999, he smoked crack in his bedroom, which was at the back of the house, located at 11254 South May. Afterward, he sat on the front porch, where he saw Chambers, whom he knew as "Baby Girl," walking down the street. The two talked about exchanging crack for sex, so defendant went down the street and purchased two dime bags of crack. The two smoked crack in his bedroom and then had sex. Afterward, Chambers asked for some of defendant's crack, but when he said no, she became angry and began yelling.

Defendant told Chambers to leave; he was concerned that his sister would come home and discover that he was smoking crack, as he had promised her he would not smoke crack anymore. He tried to push Chambers, who was only wearing a shirt, out the door, but she began "fighting me, swinging me." He pushed her, and she hit the wall and told him he was going to get "f--ked up" if he did not let her go. As she came at him in a "raging force," defendant pulled the belt out of his pants and "wrapped the belt around her neck to try to calm her down." He told her to get "the f--k out of my house" as she scratched his face and neck. He let the belt go and grabbed her, but she was slippery and still refused to leave.

Chambers said that she was going to get paid one way or the other, even if she had to get people to jump him. Defendant then grabbed her around the neck and squeezed to "try to put some fear inside of her." Tired and frustrated, he let her go, but she continued to fight, so he grabbed his Swiss Army knife. She seemed to be reaching for her pants before she came at him again. Although she had nothing in her hands, defendant stabbed her in the neck. Chambers started choking and appeared to be dying. Defendant "freaked out" and got a heavy duty black plastic bag from the kitchen. When he returned to his bedroom, Chambers was dead, so he wrapped her body in the bag and cleaned as much blood off the floor as he could. He got a neighbor's garbage can from the alley, rolled it to the side of his house, dumped her body in it, and put the garbage can back in the alley.

The next morning, he heard that her body had been discovered and went outside to watch the police investigation because he needed confirmation that the murder was not just a "crack dream." A neighborhood drug dealer who was related to Chambers found out that he had something to do with her murder, so he left the neighborhood. He stayed at Altgeld Gardens and then visited his son in Riverdale. While he was in Riverdale, his son's mother called the police, so when they came, he waited in a tree until they left. Trying to "forget everything [he] did in Chicago and start another life," defendant went to Grand Rapids.

During the videotaped statement, defendant said that the police and Robertson had treated him "nice" and he had no complaints.

Amy Hart, a forensic scientist for the Illinois State Police, testified that no fingerprints suitable for comparison were found on the three knives, but she found a shoe impression on one of them. She could not find any fingerprints on the plastic sheeting because it was covered with reddish-brown flakes, which appeared to be blood. The parties stipulated that no latent prints suitable for comparison were found on the garbage can.

Robert Berk, a trace evidence analyst, testified that he found the same green and black plastic material on the bedspread, fitted sheet, and pillowcase, as well as the T-shirt, bra, and hair tie recovered from Chambers's body. He could not identify what the substance was. No semen was found on Chambers's T-shirt and bra.

The parties also stipulated that Chambers's blood was found on the belt recovered from defendant's house. The bedspread contained a DNA mixture of three people; defendant could not have contributed to the mixture, but the female DNA profile matched Chambers's profile. In addition, a pair of jeans found in the back bedroom contained the DNA of two people. One of the DNA profiles matched defendant's, and Chambers could not be excluded from contributing to the other profile.

The medical examiner testified that Chambers was strangled. There was also a stab wound on the side of her neck that went into her voice box. This injury was not fatal by itself. In addition, she had abrasions and bruises to her face, indicating blunt force trauma. Although there was no evidence of injury to her vagina, she had bruises on her thighs that, according to the medical examiner, were consistent with having her legs pried apart. Chambers's fingernails were very short, so they could not be clipped for evidence. Chambers had alcohol and benzoylecgonine, a breakdown product of cocaine, in her system.

Defendant testified on his own behalf. He denied knowing Chambers, taking her to his house, smoking crack with her, having

sex with her, or killing her. He testified that in July 1999, he was living with his sister, her children, and her boyfriend at 11254 South May. His bedroom was in the basement. The rear bedroom that the police identified as the location where the murder occurred was not defendant's bedroom; rather, it was an "open room" where company could drink or play cards.

On July 20, 1999, he went to a party that an "associate" of his, James Tutson, had in Riverdale. Someone named Ray, whose last name defendant did not know, picked him up at 11:30 p.m. and drove him to the party, and he did not return home until 6 a.m. After changing his clothes in his basement bedroom, defendant drank a beer in the family room, where he slept until a loud noise woke him up. He looked out the kitchen window and, seeing a crowd of people in the alley, went outside and saw Chambers's body. While he was outside, he spoke to the police and his neighbors.

He continued to stay at 11254 South May for three days; however, he had a conversation with a "group of guys," which included Chambers's brother, and left for Michigan the same day. He lived in Michigan with his fiancée until the time of his arrest in November 2004.

After defendant was arrested, he told the detectives that he knew nothing about the murder. However, the detectives threatened him and told him details about the murder. In addition, the police did not inform him of his constitutional rights. He asked to call his attorney, but the police would not let him. The police told him that they found his DNA and fingerprints, which he said was impossible.

The detectives left and then returned for a second conversation. Defendant continued to deny involvement in the murder. He testified that the police threatened to tell his employer and building manager what he was arrested for and threatened to tell the victim's family where he lived. Defendant eventually confessed because he was tiring of the interrogation and "was feeling feared for my family safety." The detectives told him he could get time for first-degree or second-degree murder, and if defendant did not tell Robertson exactly what they told him, then they would reject the deal and have Robertson charge him with first-degree murder. He lied in the videotaped statement and only repeated the statement that the detectives gave him before they met with Robertson.

On rebuttal, Przepiora testified that defendant was also known as James Tutson. When he interviewed defendant in Grand Rapids, defendant did not say that he had gone to a party the night of July 20, 1999, or that he left Chicago because of a conversation he had with a member of the victim's family. Defendant never asked for an attorney,

and Przepiora did not advise him not to ask for one. He did not threaten defendant.

The jury found defendant guilty of first-degree murder and not guilty of aggravated criminal sexual assault.

## C. Sentencing Hearing

On the date that defendant's case was set for sentencing, defense counsel asked the trial court to postpone the sentencing hearing. After receiving a copy of the presentence report (PSI), defense counsel argued that he was not prepared to present mitigation evidence. The court, however, noted that "what's contained in the PSI is pretty *pro forma*. I mean, they get this information from your client. *** So I can't imagine there's anything startling in there that he would be confronted with." The court passed the case and allowed defendant and his counsel to discuss the PSI and "see what it is that may be a problem." Defendant corrected several items in the PSI, and the request for continuance was denied.

Defense counsel further requested that the trial court bifurcate the sentencing hearing. After the State presented evidence in aggravation, defendant presented the following offers of proof: that Mary Shaw, defendant's fiancée, would testify that she was living with him in Michigan and that he worked to support her and her children; that Frankie Rattiff, defendant's maternal grandmother, would testify that he presented himself to her as a devoted family man, and while he was in Michigan, he called her regularly; and that William Slate, defendant's neighbor, would testify that defendant did odd jobs for him and that he found defendant to be courteous and respectful. The trial court noted that the testimony from Shaw and Rattiff was supported by the PSI, and Slate had testified during the trial, so "all of that material is presently before the Court in some form or another." Noting that bifurcating the sentencing hearing would require Chambers's relatives from Florida and St. Louis to return, the court denied defendant's motion and sentenced him to 45 years' imprisonment.

## II. ANALYSIS

### A. Right to Present a Defense

■ First, defendant contends that he was denied his due process right to present a defense when he was not allowed to testify about conversations he had with the victim's brother that caused him to leave town following her death.

Defendant did not include this argument in his posttrial motion. "*Both* a trial objection *and* a written post-trial motion raising the is-

sue are required for alleged errors that could have been raised during trial." (Emphasis in original.) *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Therefore, the issue is procedurally forfeited.

Defendant argues that trial counsel's failure to properly preserve this claim constituted ineffective assistance of counsel. To show ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). There is a strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Courts will not find ineffective assistance based merely on tactical miscalculations, as counsel's strategic choices are "virtually unchallengeable." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994).

Defendant alternatively argues that we should consider his argument pursuant to the plain-error doctrine. See 134 Ill. 2d R. 615(a). This doctrine serves as a " 'narrow and limited exception' " to the general rule of procedural default. *People v. Szabo*, 113 Ill. 2d 83, 94 (1986), quoting *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982). The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to review an unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under the first prong, "the defendant must prove 'prejudicial error.' That is, the defendant must show that the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187. Under the second prong, "the defendant must prove that there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. "In both instances, the burden of persuasion remains with the defendant." *Herron*, 215 Ill. 2d at 187. Defendant invokes both prongs of the plain-error rule.

Upon a careful review of the record, we find that the evidence was not closely balanced. Defendant confessed to the murder in his videotaped statement and to Przepiora. While defendant testified at trial that his confession was coerced, he said in the videotaped statement that the police and Robertson had treated him "nice" and he had no complaints. Furthermore, the victim's DNA was on the bedsheets, the mattress pad, and the belt found in the back bedroom at defendant's sister's house. Defendant's DNA was on a pair of jeans found in the same room, and the same unidentifiable plastic material

was found on the victim's clothes and the bedding. Defendant's videotaped confession—a version of events supported by the physical evidence—provided that he went to Grand Rapids in an attempt to "forget everything [he] did in Chicago and start another life." Thus, we find that the evidence was overwhelming.

Defendant also invokes the fundamental-fairness prong on the basis that the trial court made an evidentiary ruling that deprived him of his right to present a defense. For the reasons that follow, however, we find that plain error did not occur.

An accused has the " 'right to present a defense, the right to present the defendant's version of events as well as the prosecution's to the jury so it may decide where the truth lies.' " *People v. Manion*, 67 Ill. 2d 564, 576 (1977), quoting *Washington v. Texas*, 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923 (1967). In addition, consistent with the right to present a defense, the accused has the right to show, by competent evidence, facts that "tend to prove that he did not flee from the scene of the crime from a consciousness of guilt." *Manion*, 67 Ill. 2d at 576.

During defendant's direct examination, the following exchange occurred:

"MS. MORIARTY [defense attorney]: During those three days after Miss Chambers was found, did anything unusual happen to you?

DEFENDANT: Yes, Ma'am.

MS. MORIARTY: What happened?

DEFENDANT: I was met with a group of guys. Had a discussion about finding of Sylvia's body.

＊ ＊ ＊

MS. MORIARTY: And who did you recognize them to be?

DEFENDANT: Well, one was Sylvia's brother. The rest was just friends.

＊ ＊ ＊

MS. MORIARTY: During that conversation did anything unusual happen?

DEFENDANT: Yes, Ma'am.

MS. MORIARTY: What happened?

DEFENDANT: I was being threatened at that time.

MS. NAZARIAN [assistant State's Attorney]: Objection.

THE COURT: Sustained. I'll strike it and instruct the jury to disregard it. Hearsay.

MS. MORIARTY: Without talking about what was said to you by that group of guys, how did the conversation make you feel?

MS. NAZARIAN: Objection.

THE COURT: Sustained.

MS. MORIARTY: Emmitt, based on the conversation that the group of guys had with you, what did you do?

DEFENDANT: I left.

MS. NAZARIAN: Where did you go?

DEFENDANT: I went to Michigan.

＊ ＊ ＊

MS. NAZARIAN: Did you go to Michigan the same day that you had the conversation with the group of guys or a different day?

DEFENDANT: Same day."

Defendant argues that the testimony sought by defense counsel was not hearsay, since it was presented to convey his state of mind when he moved to Michigan.

The admission of evidence lies within the sound discretion of the trial court; we will not reverse its evidentiary hearings absent a clear abuse of its discretion, resulting in manifest prejudice to the accused. *People v. Tolliver*, 347 Ill. App. 3d 203, 222 (2004). Hearsay evidence is testimony regarding an out-of-court statement offered to prove the truth of the matter asserted. *People v. Sullivan*, 366 Ill. App. 3d 770, 779 (2006). The primary rationale for the exclusion of hearsay testimony is the inability of the opposition to test the testimony's reliability through cross-examination of the out-of-court declarant. *Sullivan*, 366 Ill. App. 3d at 779. However, an out-of-court statement used for purposes other than establishing the truth of the matter asserted is not hearsay. *People v. Perez*, 209 Ill. App. 3d 457, 466 (1991). "One such purpose is to show the effect the statement had on the listener or to explain why the witness acted in a particular way." *People v. Seesengood*, 266 Ill. App. 3d 351, 358 (1994), citing *People v. Jenkins*, 190 Ill. App. 3d 115, 131 (1989); *People v. Jackson*, 145 Ill. App. 3d 626, 636 (1986) (if out-of-court statements are offered to prove the resulting effect of those statements on the listener's state of mind or to show why the listener acted as he did, the statements are not hearsay).

It is clear that defendant offered this testimony to show why he left Chicago and moved to Michigan. He was not seeking to prove through the statement of the "group of guys" the substance of the statement—*i.e.*, that they threatened defendant. Rather, the statement was offered to show that the "group of guys" made the threatening statement and the effect of the statement on defendant. Therefore, the excluded testimony did not constitute hearsay and should have been admitted into evidence. See *Seesengood*, 266 Ill. App. 3d at 358.

However, our supreme court recently reiterated that "[a]bsent reversible error, there can be no plain error." *People v. Naylor*, 229 Ill. 2d 584, 602 (2008). Erroneous exclusion of admissible evidence does

not mandate reversal unless defendant was prejudiced and the error affected the verdict. *People v. Szudy*, 262 Ill. App. 3d 695, 711 (1994). In *People v. Parker*, 194 Ill. App. 3d 1048 (1990), the trial court prohibited the defendant from explaining why he felt "nervous" at the prospect of waiting for a drug dealer. "However, *** the fact that he was nervous did get into the record." *Parker*, 194 Ill. App. 3d at 1058. In addition, although the defendant described the scene just before he shot the victim, the court would not let him answer the question " 'What did you think was about the happen?' " *Parker*, 194 Ill. App. 3d at 1058. However, the " 'crucial content' " of that answer appeared in the answer to the next question. *Parker*, 194 Ill. App. 3d at 1058-59. Since the trial court did allow the defendant "to give both direct and circumstantial evidence on this issue, the excluded evidence was merely cumulative." *Parker*, 194 Ill. App. 3d at 1059.

In *People v. Reppa*, 104 Ill. App. 3d 1123 (1982), the defendant was not permitted to testify on redirect examination why he did not feel safe when the police were around. We agreed with the defendant that evidence of his mental state at the time was both competent and proper. *Reppa*, 104 Ill. App. 3d at 1128. However, even if the trial court erred by sustaining the State's objection, the defendant's "testimony was sufficient to acquaint the jury with an explanation of his flight [that] was compatible with his innocence." *Reppa*, 104 Ill. App. 3d at 1128. We further found that, in light of the overwhelming evidence presented, the outcome of the trial would not have been different had the omitted testimony been allowed. *Reppa*, 104 Ill. App. 3d at 1128. See also *Manion*, 67 Ill. 2d 564; *Seesengood*, 266 Ill. App. 3d 351; *Szudy*, 262 Ill. App. 3d 695.

Similarly, defendant testified at trial that he had a conversation with a "group of guys," which included Chambers's brother, and, "based on that conversation," left for Michigan the same day. He described the occurrence with the "group of guys" as "unusual." On cross-examination, defendant testified that he left for Michigan without packing anything or informing his sister, with whom he lived, that he was leaving. Thus, while he was not permitted to testify that the "group of guys" threatened him or that he felt fearful as a result, it was clear from defendant's testimony that something about this "unusual" conversation was so disturbing to defendant that he left Chicago immediately with only the shirt on his back. In addition, in his videotaped confession, presented during the State's case-in-chief, defendant said that he left the neighborhood because a drug dealer who was related to Chambers found out that he had something to do with her murder. Not only was the alleged threat presented to the jury, but that evidence was part of the videotaped confession, the ver-

sion of events that the jury apparently found more credible, as they convicted him of first-degree murder.

Furthermore, in closing, both the State and defendant made comments regarding the alleged threat being the impetus for defendant's quick move to Michigan. Defense counsel referred to defendant as a "person who left town to escape those who erroneously thought he was responsible for the death of Sylvia Chambers," and the State twice referenced defendant's allegation that he was "threatened by the victim's family." Therefore, we conclude that the evidence and arguments were sufficient to acquaint the jury with an explanation of his flight that was compatible with his innocence. *Reppa*, 104 Ill. App. 3d at 1128.

Defendant argues that this case is analogous to *People v. Miller*, 327 Ill. App. 3d 594 (2002). In *Miller*, the defendant was convicted of first-degree murder after shooting his wife. During the trial, the State told the jury in opening statements and closing arguments that the defendant killed his wife because she was leaving him and presented evidence in its case-in-chief of her intent to divorce the defendant. We noted that when the intent or motive of the accused is material to the issue of his guilt, and he has a right to testify to that fact, improper exclusion of such testimony constitutes reversible error unless other sufficient evidence of his intent or motive is admitted at trial. *Miller*, 327 Ill. App. 3d at 598. Although motive was a "key issue," defendant was precluded from testifying that he contemplated divorcing his wife in 1995 and 1996. "Such testimony was clearly relevant to show the absence of motive the State had assigned to defendant." *Miller*, 327 Ill. App. 3d at 598. The defendant was further prohibited from presenting testimony to rebut the State's theory that he exhibited consciousness of guilt by hiding the gun in the basement. "In the absence of any explanation for defendant's conduct, the State argued extensively in closing argument that defendant's actions after [his wife] was shot showed his intent." *Miller*, 327 Ill. App. 3d at 599. Invoking the plainerror rule due to the "gravity of the error," we found that the trial court abused its discretion when it "[t]wice *** precluded defendant from testifying regarding a material issue in the case and then allowed the State to exploit the lack of defendant's testimony in closing arguments." *Miller*, 327 Ill. App. 3d at 599.

Defendant contends that the same result should issue here because the State, in opening statements, closing, and rebuttal arguments, attempted to portray his move to Michigan as consciousness of his guilt and elicited testimony that he was not seen in the neighborhood after Chambers's body was discovered. We find, however, that *Miller* is distinguishable. In *Miller*, absolutely *no* evidence was presented that

the defendant contemplated ending the marriage, which was "clearly relevant to show the absence of motive," nor was he allowed to present testimony to rebut the State's theory that he hid the gun in the basement, exhibiting consciousness of guilt. *Miller*, 327 Ill. App. 3d at 598. Here, defendant's trial testimony demonstrated that something about his "unusual" conversation with the "group of guys" was so alarming that he left Chicago that very day, without packing or informing his sister. Furthermore, in his videotaped confession, he specifically stated that he left the neighborhood because a drug dealer who was related to Chambers found out that he had something to do with her murder. Thus, while there was an "absence of any explanation for defendant's conduct" in *Miller* (*Miller*, 327 Ill. App. 3d at 599), here, the jury was presented with reasons as to why defendant left the area. In addition, the prosecution's closing argument in *Miller* "exploited" the defendant's lack of testimony. Here, far from exploiting the purported dearth of explanation, the State specifically acknowledged the alleged threat in closing arguments and attempted to undermine it.

Therefore, we conclude that reversible error did not occur when the trial court sustained the State's objection. We further reject defendant's contention that he suffered from ineffective assistance of counsel, since he has suffered no prejudice. See *People v. Foreman*, 361 Ill. App. 3d 136, 143 (2005); *People v. Green*, 298 Ill. App. 3d 1054, 1061 (1998).

## B. Evidence of DNA Analysis

■ Defendant next contends that the trial court erred by allowing Przepiora to testify about "positive findings on a DNA analysis" because it implied that defendant's DNA was contained in a state database. Defendant argues that since the state database only contains the profiles of convicted criminals, the evidence "insinuated" that defendant had a criminal background.

Evidence of other crimes is inadmissible to show a defendant's propensity to commit crime because it "overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment." *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). Evidence of other crimes is admissible, however, where such evidence is relevant to prove consciousness of guilt, *modus operandi*, design, motive, or knowledge. *People v. Banks*, 161 Ill. 2d 119, 137 (1994). This list is not exclusive, and evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence. *People v. Gwinn*, 366 Ill. App. 3d 501, 515 (2006). The trial court's ruling as to the admissibility of such evidence will not be

reversed absent a clear showing of abuse of discretion. *Thingvold*, 145 Ill. 2d at 452-53.

Defendant waived his argument by failing to include it in his posttrial motion. *People v. Pinkney*, 322 Ill. App. 3d 707, 715 (2000) (to preserve a question for appellate review, both a trial objection and a written posttrial motion raising the issue are required). He claims, however, that we should address his argument under the plain-error exception to the waiver rule. 134 Ill. 2d R. 615(a). Alternatively, he claims that counsel's representation was deficient for failing to preserve the alleged error in his posttrial motion. See *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Before we may apply either prong of the plain-error rule, however, we must determine whether there was any error at all. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). During the trial, the following exchange took place between the State and Przepiora:

"THE STATE: I would like to direct your attention now to approximately November 3rd of 2004. At that time did you have contact from anybody from the Illinois State Police crime lab regarding the work up of evidence recovered pursuant to this investigation?

PRZEPIORA: Yes, I did.

* * *

THE STATE: Specifically, did she give you some information about some positive findings on some DNA analysis, DNA workup?

PRZEPIORA: Yes, she did.

THE STATE: Based on that information, did you further investigate a possible location of a suspect in the homicide of Sylvia Chambers?

PRZEPIORA: Yes, I did.

THE STATE: What was the nature of the person you were looking for?

PRZEPIORA: Emmitt Weatherspoon."

Defendant compares this case to *People v. Jackson*, 372 Ill. App. 3d 112 (2007), which held that the trial court improperly admitted "other crimes" evidence when the State's DNA expert testified that blood found at the scene of the crime matched the defendant's DNA profile, which was on file in the Springfield database. Since briefing in this case concluded, our supreme court reversed *Jackson*, holding that the evidence was relevant to specifically connect the defendant to the victim's murder. *People v. Jackson*, 232 Ill. 2d 246 (2009). The court held that without the witness's brief testimony as to how the defendant was first identified, so that a buccal swab could be obtained, "there would have been confusion and speculation regarding not only

what occurred during those respective time lapses, but how the unidentified profile led to defendant." *Jackson*, 232 Ill. 2d at 269. The court found that the testimony was comparable to the situation where a defendant's fingerprints are similarly identified at trial. *Jackson*, 232 Ill. 2d at 270. See *People v. Jackson*, 304 Ill. App. 3d 883 (1999); *People v. Prewitt*, 160 Ill. App. 3d 942 (1987). We similarly find that Przepiora's brief testimony about "some positive findings on some DNA analysis" was relevant to connect defendant to the murder and to reduce jury speculation and confusion. See *Jackson*, 232 Ill. 2d at 269.

## C. Defendant's Motion *in limine*

Defendant contends that the trial court erred when it deferred ruling on his motion *in limine* seeking to bar the State from introducing his theft conviction for purposes of impeachment.

A trial court has discretion in granting a motion *in limine* and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused. *People v. Owen*, 299 Ill. App. 3d 818, 823 (1998). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

"A defendant's right to testify at trial is a fundamental constitutional right, as is his or her right to choose not to testify." *People v. Madej*, 177 Ill. 2d 116, 145-46 (1997). The decision whether to testify ultimately rests with the defendant, but it is generally made after consultation with trial counsel. *People v. Medina*, 221 Ill. 2d 394, 403 (2006); *Madej*, 177 Ill. 2d at 146.

In our original Rule 23 order dated November 26, 2008, we cited *People v. Rose*, 75 Ill. App. 3d 45, 52 (1979), *People v. Owen*, 299 Ill. App. 3d 818 (1998), and *People v. DeBerry*, 375 Ill. App. 3d 822 (2007), in holding that the trial court did not abuse its discretion when it deferred ruling on defendant's motion *in limine*. On March 25, 2009, the supreme court vacated that order with directions to reconsider our ruling in light of *People v. Patrick*, 233 Ill. 2d 62 (2009), to determine if a different result is warranted.

In *Patrick*, our supreme court analyzed the cases of two defendants, Robert Patrick and Ezekiel Phillips. Robert Patrick was charged with multiple counts of first-degree murder, attempted first-degree murder, and aggravated discharge of a firearm. Before trial, Patrick filed a motion *in limine* seeking to bar the State from introducing evidence of his prior convictions for purposes of impeachment. The trial judge summarily refused to consider the admissibility of the defendant's

prior convictions, holding that it was his procedure in every case, without exception, not to give advisory opinions. The defendant testified, and his testimony was impeached with three prior convictions for possession of a controlled substance. The jury found him guilty of second-degree murder.

The court acknowledged that, "in most cases, the trial judge will possess the information necessary to conduct a *Montgomery* hearing before trial." *Patrick*, 233 Ill. 2d at 73. It concluded that "a trial court's failure to rule on a motion *in limine* on the admissibility of prior convictions when it has sufficient information to make a ruling constitutes an abuse of discretion." *Patrick*, 233 Ill. 2d at 73. In all but the most complicated cases, a judge will have enough information before trial to weigh the probative value of admitting the prior conviction against the danger of unfair prejudice to the defendant. *Patrick*, 233 Ill. 2d at 73.

The supreme court further held that the trial court abused its discretion by refusing to exercise any specific discretion. *Patrick*, 233 Ill. 2d at 74-75. "There is no justification for a trial judge's blanket policy to withhold ruling on all motions *in limine* on the admissibility of prior convictions until after a defendant's testimony." *Patrick*, 233 Ill. 2d at 74. Therefore, the court concluded that the trial court's application of a blanket policy amounted to an abuse of discretion. *Patrick*, 233 Ill. 2d at 75.

■ In light of *Patrick*, we find that the trial court's refusal to entertain defendant's motion *in limine* before he testified was erroneous. The trial court's ruling was not based on any specific facts. Rather, the court had a blanket policy of deferring ruling on such motions until after a defendant testifies:

"[I]f he testifies, I'll make that determination after that point. I follow the holding of *People v. Bynum* here in the First District, as well as *United States v. Luce*, an older case which basically says in order to do the proper balancing of convictions, prior convictions, the Court should hear the testimony of witnesses, particularly the Defendant, first. And then I apply the factors that would go into balancing. So I understand where you're coming from, but it's premature at this point."

The *Patrick* court found such refusal to exercise any specific discretion to be an abuse of discretion. *Patrick*, 233 Ill. 2d at 74-75. "Courts should not adopt such a blanket policy but, rather, should engage in the *Montgomery* balancing test on a case-by-case basis, giving thoughtful consideration to each factor. It is a matter of simple fairness that courts should rule on such motions as soon as is practicable." *People v. Averett*, 381 Ill. App. 3d 1001, 1019 (2008), *appeal allowed*, 231 Ill. 2d 671 (2009).

The State contends that even if the trial court abused its discretion in deferring its ruling on the motion *in limine*, defendant was not prejudiced by the error because the evidence against him was overwhelming. In *People v. Holloway*, 393 Ill. App. 3d 317 (2009), another panel of this court found that the trial court's error in deferring ruling on the defendant's motion *in limine* was harmless beyond a reasonable doubt where the evidence was overwhelming. *Holloway*, 393 Ill. App. 3d at 322-23. "Therefore, the admission of defendant's prior convictions *** would not have been so crucial a factor in the jury's determination of defendant's guilt that the verdict would have been different had the evidence not been admitted." *Holloway*, 393 Ill. App. 3d at 322. Defendant argues that *Holloway* was incorrectly decided because the "*Patrick* court's harmless error analysis did not include examining other evidence in the case to determine whether overwhelming evidence supports the conviction."

The *Patrick* court, applying the harmless-beyond-a-reasonable-doubt analysis, rejected the State's argument that Patrick was not prejudiced by the error. *Patrick*, 233 Ill. 2d at 75. Patrick was "substantially prejudiced" because his counsel was unable to properly plan trial strategy and possibly anticipatorily disclose his prior convictions to lessen the prejudicial effect the convictions would have on his credibility. *Patrick*, 233 Ill. 2d at 75. His decision to testify was "critical" because he relied on a theory of self-defense, and knowing whether his prior convictions were going to be used for impeachment was a vital factor that needed to be weighed. *Patrick*, 233 Ill. 2d at 75.

*Patrick* did not discuss the strength of the evidence, except to note that the "jury's verdict of guilty of second degree murder indicates that, to some degree, the jury believed Patrick was justified in his use of force." *Patrick*, 233 Ill. 2d at 76. However, the court, citing *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), expressly held that the error can be found harmless beyond a reasonable doubt. *Patrick*, 233 Ill. 2d at 75. In *Chapman*, the United States Supreme Court determined that when an error is of constitutional magnitude, a defendant is entitled to a new trial if the error was not harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 710-11, 87 S. Ct. at 828. The test to be applied in determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). *Patterson* listed three approaches for measuring error under this harmless-constitutional-error test: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming

evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Patterson*, 217 Ill. 2d at 428, citing *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981). Therefore, while *Patrick* did not engage in a detailed discussion of the trial evidence, its express holding allows us to apply the traditional harmless-beyond-a-reasonable-doubt analysis, which includes looking to the strength of the State's evidence.

We agree with the State that the error was harmless beyond a reasonable doubt. First, unlike *Patrick* and *People v. Hogan*, 388 Ill. App. 3d 885 (2009), where the defendants relied on theories of self-defense and consent and, therefore, their decision to testify was critical, here, defendant did not rely on any such theory. In addition, defendant's oral motion *in limine* only concerned the theft conviction and made no mention of the robbery conviction. When defendant chose to testify on his own behalf, he had not yet sought a ruling on whether the robbery conviction could be used to impeach his testimony. Therefore, even if the trial court had not deferred its ruling on the admissibility of the theft conviction, defendant was still in danger of being impeached by his prior robbery conviction. Finally, unlike the prosecutor in *Patrick*, who made a "focused and repeated argument urging the jury not to believe a three-time convicted felon" (*Patrick*, 233 Ill. 2d at 75-76), here, the State made no mention of defendant's convictions in closing argument. Therefore, we conclude that the error in this case was not as prejudicial as the error made in *Patrick*.

Furthermore, as we found above, the evidence establishing defendant's guilt was overwhelming. See *Patterson*, 217 Ill. 2d at 428. Defendant confessed to the murder both in his videotaped statement and to Przepiora. He said in his videotaped confession that he went to Grand Rapids in an attempt to "forget everything [he] did in Chicago and start another life." Even though defendant claimed at trial that his confession was coerced, he said in the videotaped statement that the police and Robertson had treated him "nice" and he had no complaints. The victim's DNA was on the bedsheets, the mattress pad, and the belt found in the back bedroom at defendant's sister's house. Defendant's DNA was on a pair of jeans found in the same room, and the same unidentifiable plastic material was found on the victim's clothes and the bedding.

As in *Holloway*, we find that the admission of defendant's prior conviction would not have been so crucial a factor in the jury's determination of defendant's guilt that the verdict would have been different had the evidence not been admitted. *Holloway*, 393 Ill. App. 3d at 322. Accordingly, we conclude that the trial court's deferred rul-

ing on defendant's motion *in limine* was harmless beyond a reasonable doubt.

## D. State's Closing Argument

■ Defendant next argues that the State's comments in closing denied him of his right to a fair trial, since they were not based on the evidence and their only purpose was to inflame the passions of the jury. Specifically, the State argued the following in rebuttal:

"And as far as what he has done to the victim, he didn't just—he didn't just sexually assault and murder her. He is trying to further assault her now by assaulting her memory. Because what he is trying to is dirty up the victim and make it sound as if *** she and her family aren't worthy of any consideration from you whatsoever. ***

And the reason he is saying that and the reason he is doing that by saying that he was threatened by the victim's family or by suggesting that somehow the victim's family was going to do something to minimum [*sic*] is because he wants you to believe that if they're bad people, that he will look better by comparison. That somehow her actions, her involvement with cocaine or this alleged drug connection with the family, there is no evidence of that whatsoever. Did Mr. Chambers look like a drug dealer to you? There is no evidence of that. But he is hoping if he suggests to you that she is somehow garbage, that it would be open season on her. That he is entitled somehow to sexually assault her, to treat her like garbage."

"[D]efendant faces a substantial burden in attempting to achieve reversal [of his conviction] based upon improper remarks made during closing argument." *People v. Williams*, 332 Ill. App. 3d 254, 266 (2002). Prosecutors enjoy wide latitude in closing arguments. *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). In reviewing comments made at closing arguments, this court asks whether they "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). A reviewing court will not reverse a jury's verdict based on improper remarks made during closing arguments unless the comments resulted in substantial prejudice to the defendant and constituted a material factor in his conviction. *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004).

Defendant contends that the comments were not based on the evidence. "To be proper, closing argument comments on evidence must be either proved by direct evidence or be a fair and reasonable inference from the facts and circumstances proven." *People v. Hood*, 229 Ill. App. 3d 202, 218 (1992). We find that the State's comments were supported by the evidence. First, although the "threats" that

defendant attempted to testify about were stricken by the court, in his videotaped confession, defendant stated that he left the neighborhood because a neighborhood drug dealer who was related to Chambers discovered that he had something to do with her murder. In addition, during closing argument, defense counsel argued that defendant "left town to escape those who erroneously thought he was responsible for the death of Sylvia Chambers." The comment that defendant felt "entitled" to treat Chambers "like garbage" is also a reasonable inference from the evidence, which showed that defendant dumped her body in a garbage can in an alley. Accordingly, we hold that the State's comments in closing were not erroneous.

## E. Sentence

■ Finally, defendant argues that he is entitled to a new sentencing hearing because the trial court refused to give defense counsel three days to review the PSI or to bifurcate the sentencing hearing. The sentencing decisions of a trial court are entitled to great deference and weight; a sentence is presumptively correct, and a trial court's sentencing decision will not be disturbed, absent an abuse of discretion. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001); *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007), citing *People v. Govea*, 299 Ill. App. 3d 76, 91 (1998).

Defendant contends that he was entitled to have three days to review the PSI to prepare mitigation pursuant to section 5—3—4 of the Unified Code of Corrections (730 ILCS 5/5—3—4 (West 2004)). He argues that because he did not receive the PSI until the day of the hearing, the trial court should have either granted a continuance or bifurcated the sentencing hearing so that he could bring in live mitigation witnesses.

Section 5—3—4 provides that presentence reports shall be "filed of record with the court in a sealed envelope" and open for inspection "to the state's attorney and the defendant's attorney at least 3 days prior to the imposition of sentence, unless such 3 day period is waived." 730 ILCS 5/5—3—4(a), (b)(2) (West 2004). However, the presentence report need not be tendered to defense counsel three days before the sentencing hearing. *People v. Fort*, 248 Ill. App. 3d 301, 319 (1993). Section 5—4—3 "requires only that the report be open for inspection, suggesting that the attorney must make a request to inspect the report." *Fort*, 248 Ill. App. 3d at 319.

Defendant's sentencing date had been set more than a month beforehand, and that date was agreeable to all counsel. See *Fort*, 248 Ill. App. 3d at 319. Furthermore, there is no indication in the record that defendant requested to inspect the reports three days before the

hearing. "In fact, we have no reason to believe that the report was not open for inspection three days before the sentencing hearing." *Fort*, 248 Ill. App. 3d at 319. Furthermore, although defendant explains that the three-day period gives defense counsel "time to review the PSI for accuracy," defendant and his counsel were given the opportunity to confer and correct the report. See *People v. Zinnamon*, 266 Ill. App. 3d 671, 679 (1993). In addition, defendant presented an offer of proof for three witnesses; one of them, Slate, had testified at trial, and the offer of proof as to defendant's fiancée and grandmother simply corroborated the PSI. "On appeal, defendant has not named any other witnesses who would have testified had a continuance been granted." *Zinnamon*, 266 Ill. App. 3d at 679. Thus, defendant has not demonstrated that the trial court abused its discretion by denying his motions for a continuance and to bifurcate the sentencing hearing. See *Zinnamon*, 266 Ill. App. 3d at 679 (a reviewing court will not set aside a sentence absent a showing of actual prejudice from an error).

Defendant relies on *People v. Hemphill*, 62 Ill. App. 3d 977 (1978), which is readily distinguishable. In *Hemphill*, the presentence report was never filed, was not available to the appellate court, and was not made available to the defendant's attorney at least three days before the imposition of the sentence. Because the report was not in the record, as required by section 5—3—4(b)(3), it was "impossible to ascertain with certainty the origin of the report, when it was prepared[,] or what it contained." *Hemphill*, 62 Ill. App. 3d at 985. See 730 ILCS 5/5—3—4(b)(3) (West 2004) (PSI must be open for inspection to an appellate court in which the conviction or sentence is subject to review). Here, the report was filed and made available to this court.

■ Defendant further contends that the sentence imposed by the trial court was excessive because it was more than twice the minimum sentence for first-degree murder. See 730 ILCS 5/5—8—1(a)(1) (West 2004) (sentencing range for first-degree murder is 20 to 60 years' imprisonment). According to defendant, the sentence does not reflect the efforts that he made on his own to be a productive member of society. Defendant cites the offer of proof of his fiancée, Shaw, who would have testified about defendant's work history and his commitment to his family for the previous five years. He contends that this testimony would have shown not only that he was capable of rehabilitation, but that he was already rehabilitated, as evidenced by his "for the most part, staying out of trouble" while he lived in Michigan.

The sentencing decisions of a trial court are entitled to great deference and weight because "a trial judge is in a far better position than

an appellate court to fashion an appropriate sentence" based on firsthand consideration of the defendant's credibility, demeanor, moral character, and other relevant factors. *Govea*, 299 Ill. App. 3d at 91, citing *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). In determining a sentence, the trial court must balance the interests of society against the ability of a defendant to be rehabilitated. *Tye*, 323 Ill. App. 3d at 890. However, a trial court is not required to give greater weight to the rehabilitative potential of a defendant than to the seriousness of the offense. *Govea*, 299 Ill. App. 3d at 91. In fact, the seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence. *Tye*, 323 Ill. App. 3d at 890.

We find that the trial court did not abuse its discretion in setting a 45-year sentence. The court specifically reviewed mitigating factors, noting defendant's stable relationship with Shaw, his education level, and family background, among others. While defendant contends that he was "already rehabilitated" and that, "for the most part," he "stay[ed] out of trouble" in Michigan, he seems to ignore that he was convicted of three crimes in Michigan: possession of marijuana, larceny, and driving with a suspended license. The court also noted that an aggravating factor was the crime itself: defendant strangled and stabbed Chambers and left her body in a garbage can. In addition, he was previously convicted of theft and robbery.

Therefore, we conclude that the trial court did not abuse its discretion when it sentenced defendant to 45 years' imprisonment.

## III. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

QUINN and COLEMAN, JJ., concur.